[No. F048615. Fifth Dist. Dec. 14, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
EDITH ANN BOWERS, Defendant and Appellant.

**COUNSEL**

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Lloyd G. Carter and Brian Alvarez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GOMES, J.**—In December 2001, defendant Edith Ann Bowers was found not guilty by reason of insanity (NGI) of two counts of battery on correctional officers (Pen. Code, § 4501.5).[1] The court committed Bowers to the Department of Mental Health (DMH) for a maximum period of incarceration of four years.

In March 2005, a petition for extended commitment under section 1026.5 was filed alleging pursuant to the DMH's recommendation that Bowers qualified for an extension of her commitment under section 1026.5, subdivision (b), she was being held at Napa State Hospital (NSH) as a result of a two-year extension of her commitment ordered on March 22, 2004, and her maximum term of incarceration was to expire on August 16, 2005. The petition further alleged Bowers had been convicted of a felony and sentenced to NSH per section 1026.5, and she was a person who, by reason of a mental disease, defect or disorder, represented a substantial danger of physical harm to others.

After waiving a jury trial, a court trial was held in June 2005. The matter was submitted on the reports of Drs. Michael Zimmerman and Robert Taylor.

---

[1] Undesignated statutory references are to the Penal Code.

The court found the petition's allegations true and that by reason of mental disease, defect or disorder, Bowers represented a substantial danger of physical harm to others. Accordingly, the court issued an order extending Bowers's commitment for two years to August 16, 2007.

On appeal, Bowers contends, and the People concede, that following the recent case of *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), section 1026.5, subdivision (b)(1), must be interpreted as requiring proof that a person under commitment have a mental disease, defect or disorder that causes that person to have serious difficulty controlling dangerous behavior. The parties disagree, however, whether substantial evidence supports such a finding in this case. We agree with the People substantial evidence supports such a finding. Accordingly, we will affirm the order.

## FACTS

*Report of Michael Zimmerman, Ph.D.*

Dr. Zimmerman, a clinical psychologist, examined 41-year-old Bowers, reviewed her clinical history and diagnosed her as suffering from a schizoaffective disorder, alcohol dependency, and borderline personality disorder. In rendering this diagnosis, Dr. Zimmerman relied on Bowers's history of learning disabilities. He noted she had experienced psychiatric problems since she was 15 years old and had been hospitalized 26 times for major depression, auditory hallucinations and suicidal ideation. Bowers had participated in day treatment programs and outpatient psychotherapy, and had been treated in the past with seven different medications. Her most recent medications at NSH were two medications prescribed for depression, suicidal ideation and auditory hallucinations. Although Bowers denied a history of substance and alcohol abuse, her records indicated she had an extensive history of alcohol dependency.

Dr. Zimmerman reviewed Bowers's progress reports from NSH, which stated that in November 2004, she was placed under close supervision due to intense agitation and suicidal ideation; in December 2004 she expressed paranoid delusions of being assaulted or threatened by "tall men"; and in January 2005, she was noted to be stiffened and trembling, and asked for medication to reduce her intense agitation. She explained the November 2004 incident by stating " 'I got pissed off at another inmate.' " The reports also note that Bowers had been compliant and cooperative in her treatment and medication.

Bowers's mental exam revealed she currently hears voices telling her to do things that she does not want to do. Bowers explained that "[s]ometimes they

tell me to be suicidal. They tell me to go off on people." Dr. Zimmerman described these as "command hallucinations to commit suicide, attack people, and/or, '. . . do things I don't want to do.' " Bowers was functioning at a low-average intellectual range, and her insight, judgment and impulse control were all considered impaired. When Dr. Zimmerman asked Bowers about her alleged attack on prison personnel in 2000, Bowers responded she became agitated and angered because they would not give her medication on demand. Bowers also told Dr. Zimmerman: " 'Unless you want me to get other charges, get me meds.' " When asked about her aftercare plans, Bowers said she wanted to go back to Sacramento, work on a ranch, stay on her medications and go to her psychiatrist as ordered. When asked what might increase the possibility of relapse, Bowers stated, "Not staying on my meds or (not) seeing the psychiatrist as I'm suppose to . . . if I listen to people (who) tell me I don't need meds."

Dr. Zimmerman noted that Bowers's description of her mental illness failed to address the unstable nature of her condition, her alcohol dependency and her assaultive, suicidal and self-injurious impulses. He also stated that her self-identified aftercare plan of attending scheduled psychiatric appointments overestimated her ability to follow through and failed to address the psychiatric emergencies, the command hallucinations and assaultive impulses that unpredictably overcome her. Dr. Zimmerman concluded Bowers had poor insight into or understanding about her mental condition, her mental illness was not in remission and rendered her a danger to herself or others, and she was not able to be maintained safely in an outpatient treatment program.

### Report of Robert Taylor, Ph.D.

Dr. Taylor, a clinical psychologist, examined Bowers, reviewed her clinical history, and diagnosed her as suffering from a depressed-type schizoaffective disorder with alcohol abuse. He noted Bowers began having psychiatric problems when she was 15 years old and had been committed involuntarily to psychiatric hospitals at least five times prior to her current commitment. Dr. Taylor reported she had been on psychotropic medications in the past, and presently was prescribed valproic acid and an antidepressant.

During the interview, Bowers denied having current hallucinations, but then reported that two to three weeks before the interview " 'when they took me off of my Haldol I was hearing things like to kill myself but I worked through it because it says I'm getting too close to getting out.' " Bowers did acknowledge having auditory hallucinations about once a week while in the hospital, which told her either to kill herself " 'or go kill other people and shit like that. But I can't let it control me. I do my best with it.' " Bowers denied having current suicidal or homicidal ideation or intent, although she told Dr. Taylor

she had attempted to kill herself about two months before by cutting her arm with a plastic knife. Bowers also denied having mood swings or a decreased need for sleep, but reported that the day before the interview she experienced "racing thoughts" and thought she was "going bananas but I worked through it. I was telling the other girl that I hadn't seen the doctor yet and he needed to get in here and see me and he better get in her[e] because I was getting upset. She got an earful." Dr. Taylor noted Bowers appeared to be getting "somewhat agitated and pressured as she related the incident."

When asked to describe the offense for which she was found NGI, Bowers explained she "went off" on a prison social worker and in the process, kicked one correctional officer and scratched another. Bowers said she didn't think they were giving her the right kind of medication because she wanted what she had on the outside, so she "got irritated and told the social worker which end to go up. Not giving me [the] right kind of meds. I know what happens. Nobody would listen to me. So I got irritated and went off." She felt like no one was listening to her and she thought if she "got somebody's attention they'd give me the right kind of medication that I needed."

Bowers acknowledged her depression and anger management problems, but denied abusing alcohol, although hospital records indicated a history of alcohol abuse. Bowers explained she was ready for release from NSH because she felt she had fully benefited from treatment; there was nothing left for her to do. Bowers believed she was learning to control herself and felt she would be able to function in an outpatient program. When asked about her discharge plans, Bowers said she could take care of herself, take her medicine the "right way" and take herself "to groups when the judge tells me I need to go, if I need to go." She also said she would see a psychiatrist. When asked what risk factors could precipitate a relapse, Bowers responded that was hard to say, but she thought she would " 'have a hard time with her anger problem . . . . Because sometimes I get angry like I went off in anger at someone in prison. I need to work on let[ting] people know I'm angry and I need some time.' "

Bowers disagreed with her hospital doctors' recommendations to extend her commitment. Bowers said the doctors wanted to see her in an open unit before she was released, but she didn't want to do that because she wanted to be released as soon as she could. Bowers did not see how she would benefit from an open unit, and believed she'd be better going straight out to the community and into a day program. Bowers reasoned: "If I'm suitable in a year from now why aren't I suitable to go right now?"

Dr. Taylor opined that due to her unstable psychotic condition, Bowers had not improved to such an extent that she was no longer a danger to the health

and safety of others, and recommended an extension of her state hospital commitment. Dr. Taylor concluded Bowers still suffered from auditory hallucinations, as shown by her attempt to harm herself just two months before in response to such hallucinations. He found her reasoning about her readiness for hospital discharge "strained and illogical bordering on delusional in its rigidity." Dr. Taylor also concluded that although Bowers had some limited insight into the severity of her mental illness, she had poor judgment. He noted that in addition to auditory hallucinations, recent suicidal ideation, rigid thinking and poor judgment, Bowers still had problems with angry outbursts and poor anger control, and suffered from agitation, all of which were present at the time of the instant offense.

Dr. Taylor opined that given the presence of these symptoms in the highly structured jail and hospital environments, Bowers would be expected to quickly deteriorate if released, endangering the health and safety of other people. Her objection to the hospital's recommendation of transfer to an open unit reflected confused thinking and a disengagement from treatment even while in the hospital setting. She was in denial about the severity of her mental illness and was thus at high risk of treatment noncompliance if released into the community. He concluded "[d]ecompensation o[n] her part would result in more acute psychotic symptoms which would likely lead to further acts of violence towards others."

## DISCUSSION

*The Elements of a Section 1026.5 Recommitment*

Under section 1026.5, subdivision (b)(1), "[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." The maximum term of commitment prescribed in subdivision (a) is "the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted . . . ." (§ 1026.5, subd. (a)(1).)

█ At no less than 90 days before the term of commitment ends, the prosecuting attorney may file a petition for extended commitment in the superior court which issued the original commitment. (§ 1026.5, subd. (b)(2).) The person named in the petition has a right to be represented by an attorney and the right to a jury trial. (§ 1026.5, subd. (b)(3).) If, after trial, the court or jury finds the patient "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others," the patient will be recommitted for an additional period of two years from the date of termination of the previous commitment. (§ 1026.5, subd. (b)(8).)

In *Howard N.*, our Supreme Court considered whether the extended detention scheme in Welfare and Institutions Code section 1800 et seq., which provides for the civil commitment of a person at the time he or she otherwise would be discharged from a Youth Authority commitment, violated due process because it did not expressly require a finding that the person's mental deficiency, disorder or abnormality causes serious difficulty in controlling behavior.[2] (*Howard N., supra*, 35 Cal.4th at p. 122.) After recognizing civil commitment constitutes a significant deprivation of liberty that requires due process protection, the court noted that a recent series of cases in the United States and California Supreme Courts had "clarified that to be involuntarily civilly committed as a sexually violent predator, the person must, as a result of mental illness, have serious difficulty controlling his dangerous behavior. [Citations.]" (*Id.* at pp. 127–128.) To explain the United State Supreme Court's reasoning, the court quoted *Kansas v. Hendricks* (1997) 521 U.S. 346, 358 [138 L.Ed.2d 501, 117 S.Ct. 2072]: " 'A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a "mental illness" or "mental abnormality." [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' " (*Howard N., supra*, 35 Cal.4th at p. 128.)

The court found the United States Supreme Court's constitutional pronouncements were instructive with respect to due process standards for the civil commitment of dangerous mentally ill persons who are not sexually violent predators, since nothing in the language of those cases indicated the lack of control requirement was limited to the sexually violent predator context. (*Howard N., supra*, 35 Cal.4th at pp. 131–132.) Applying those due process standards to the extended detention scheme in Welfare and Institutions Code section 1800 et seq., the court concluded the scheme "should be interpreted to contain a requirement of serious difficulty in controlling dangerous behavior." (*Howard N., supra*, 35 Cal.4th at p. 132.) Accordingly, the court held the extended detention scheme required "that the state demonstrate that the 'mental . . . deficiency, disorder, or abnormality' causes the person to have serious difficulty controlling his dangerous behavior." (*Id.* at p. 136.)[3]

---

[2] As explained by the court in *Howard N.*, to extend a commitment under the statutory scheme at issue there required "a finding that the person is 'physically dangerous to the public' because of a 'mental . . . deficiency, disorder, or abnormality.' (§ 1801.5.)" (*Howard N., supra*, 35 Cal.4th at p. 132.)

[3] In light of the holding in *Howard N.*, Welfare and Institutions Code section 1800 was amended effective July 21, 2005, to include the additional element. It now reads, in pertinent

■ Bowers contends that following *Howard N., supra*, 35 Cal.4th 117, section 1026.5, subdivision (b)(1), must be interpreted as requiring proof that a person under commitment has a mental disease, defect, or disorder that causes serious difficulty in controlling his or her dangerous behavior. This issue was recently considered by the Third District Court of Appeal in *People v. Galindo* (2006) 142 Cal.App.4th 531 [48 Cal.Rptr.3d 241], in which the court accepted the People's concession that under *Howard N.*, section 1026.5, subdivision (b)(1) "must be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior." (*Galindo, supra*, 142 Cal.App.4th at p. 536.) We agree with the *Galindo* court that given the similarity between section 1026.5 and Welfare and Institutions Code section 1800 et seq., section 1026.5, subdivision (b)(1) should be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior, and therefore accept the People's concession that this interpretation is required here.[4]

*Substantial Evidence*

Bowers next contends the trial court's recommitment order is not supported by substantial evidence because there is insufficient evidence to support a finding she has a mental disease, defect, or disorder that causes serious difficulty in controlling her dangerous behavior. We disagree.

■ " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others" under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier

---

part, "Whenever the Department of the Youth Authority determines that the discharge of a person . . . would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality which causes the person to have serious difficulty controlling his or her dangerous behavior . . . ." (Welf. & Inst. Code, § 1800.)

[4] Bowers contends, and the People concede, that we also should construe section 1026.5, subdivision (b)(1), as allowing recommitment when the person potentially recommitted has a mental disease, defect or disorder which *either* causes the person to have serious difficulty controlling his or her behavior *or* seriously affects his or her capacity to properly perceive or process reality, or both, such that the person is a substantial danger of physical harm to others. The only authority the parties rely on for this proposition is a case the California Supreme Court ordered not published after the People filed the respondent's brief but before Bowers filed her reply brief, *People v. Green* (Jan. 26, 2006, D044632) review denied and opinion ordered nonpublished May 17, 2006, S141726. As this case has been ordered not published, we decline the parties' invitation to follow its reasoning. Therefore, we reject Bowers's argument on this point, as well as the People's concession.

of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" (*People v. Crosswhite* (2002) 101 Cal.App.4th 494, 507–508 [124 Cal.Rptr.2d 301].) A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5. (*People v. Superior Court* (*Williams*) (1991) 233 Cal.App.3d 477, 490 [284 Cal.Rptr. 601].)

■ By the parties' agreement, the only items of evidence presented at the extension hearing were the medical reports of the two psychologists who examined Bowers. Both reports note that Bowers has a long history of chronic mental illness. Both Dr. Zimmerman and Dr. Taylor concluded Bowers suffered from schizoaffective disorder, that her condition was unstable, and she continued to experience auditory hallucinations which commanded her to hurt herself or others. While Bowers told the doctors she was able to resist those commands, she was not always able to do so, as evidenced by her suicide attempt two months before her interview with Dr. Taylor. Based in part on Bowers's poor impulse and anger control, the command hallucinations that order her to hurt others, and her history of assaultive behavior toward others, both doctors opined that Bowers's mental illness rendered her a danger to others and she could not be maintained safely in outpatient treatment. As Dr. Taylor explained, "[t]his examiner would opine that, at present, [Bowers's] risk of treatment noncompliance in a community setting would be high. Decompensation [on] her part would result in more acute psychotic symptoms which would likely lead to further acts of violence towards others." These opinions clearly establish that Bowers's mental illness caused her to have serious difficulty controlling her violent impulses and she continued to present a substantial danger of physical harm to others should she be released.

Bowers contends reversal is required because the court's failure to expressly find she suffered from a mental illness that caused her serious difficulty in controlling her behavior is not harmless beyond a reasonable doubt. Based on the evidence presented, however, no rational trier of fact " 'could have failed to find [Bowers] harbored a mental disorder that made it seriously difficult for [her] to control [her] violent . . . impulses,' " thereby rendering the trial court's failure to expressly find this element " 'harmless beyond a reasonable doubt.' " (*Howard N., supra,* 35 Cal.4th at p. 138.) The evidence presented established beyond a reasonable doubt that Bowers (1) had a mental disorder, and (2) that condition caused her to have serious difficulty controlling her behavior such that (3) she presented a substantial danger of physical harm to others. Thus, the trial court's failure to make an express finding on this issue was harmless beyond a reasonable doubt. Viewed in the light most favorable to the extension order, the court's determination that Bowers should be recommitted under section 1026.5 is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

Vartabedian, Acting P. J., and Wiseman, J., concurred.