Opinion
LAMBDEN, J.
Appellant Paul Zapisek seeks reversal of the trial court’s order extending his commitment for two more years pursuant to Penal Code section 1026.5, subdivision (b), contending that there was a lack of substantial evidence submitted below that he represented a substantial danger of physical harm to others. We affirm the trial court’s order.
BACKGROUND
As of November 2005, Zapisek was 63 years old. In September 1997, he assaulted an elderly stranger on a street in San Francisco because he believed the stranger was Satan, using a knife in the assault. The trial court found Zapisek to be legally insane at the time of the offense, and subsequently ordered him committed to Atascadero State Hospital pursuant to Penal Code section 1026.5, subdivision (b),[1] setting his maximum state prison confinement time at 48 months.
Zapisek, who was transferred to Napa State Hospital in 1998, consented to an extension of his commitment twice, the second commitment ending in September 2003. The court extended his commitment to September 2005 after the People petitioned for this extension. In June 2005, the People petitioned to extend Zapisek’s commitment an additional two years, and a court hearing followed.

First Expert Witness for the People

The People called as an expert witness Nina Woods, a Napa State Hospital clinical psychologist who worked with Zapisek. Woods testified that, while she was not an expert on actuarial risk, she did make ongoing risk assessments in the course of her daily duties and had some formal training in risk assessment. Over Zapisek’s counsel’s objection, the court qualified her as an *1155 expert regarding whether Zapisek represented a substantial danger of physical harm to others or himself as a result of a mental disease, defect, or disorder.
In Woods’s opinion, Zapisek suffered from schizoaffective disorder, bipolar type, and had a combination of symptoms, some of which affected his thinking ability. In particular, he had ongoing problems with delusions that had “not been responsive to medication over the years.” While some of his delusions were benign, “the delusions that gave [her] concern about the probability that he could be violent are those of which he’s very fearful that others are trying to harm him.” She continued: “So, he has had ongoing— multiple ongoing delusions that leave him very fearful. That gives me concern about his dangerousness because it’s so similar to the situation that led to his instant offense when he believed that the person he had attacked was, in fact, the devil.”
Woods also stated that Zapisek believed his delusions “wholeheartedly, and he’s not able to see that they might be symptoms of his mental illness and react to them in more appropriate ways.” Woods’s expert opinion, based on her clinical judgment, which was in turn based on her experience, her knowledge of Zapisek, and factors that are considered with certain predictive tests, was that Zapisek currently represented a substantial danger of doing physical harm to other people.
Woods provided examples of Zapisek’s delusions. She testified that Zapisek “has on many occasions told us that the president is going to try to harm him; that he’s sent asbestos to get him; that he will try to hurt him in some way . . . and he’s trying to harm him.” When Zapisek came to her unit in December 2004, “he believed that the president had caused his family to be killed. He hadn’t been able to reach them in recent weeks. He was also afraid to call anyone to ask about his family because he was afraid that whoever he called would be killed by the president.”
She also stated that “[t]here have been multiple other examples of times [Zapisek’s] been delusional and has taken action on it.” For example, Zapisek had recently put tape over the alarm sensors in the hospital believing them to be video cameras that were tracking him. While Woods did not believe Zapisek intended to harm anyone, he effectively disabled the alarm sensors and could have prevented patients from receiving aid during a medical emergency.
On another occasion, Zapisek became frightened that workmen working on the hospital windows for safety purposes were doing so in order to get back in at night and harm him. Although the staff assured him that was not the case, Zapisek asked the art therapist to get him a knapsack and some clothes and hide them, and to help him escape from the hospital.
*1156 Only a few months before the hearing, Zapisek became convinced that the hospital owed him $450. He became agitated and demanded the money. Woods thought Zapisek demanded the check in an intimidating manner, but he did not say anything that was directly threatening and ultimately calmed down in the course of the discussion.
Woods testified that Zapisek was not in remission. While he understood that he had a mental illness, “[h]e has much more difficulty in being able to know the mental illness when the symptoms are there.” She stated that he had denied having any kind of paranoia to social workers, and that has “most often been his response when we talked about things that we see as being paranoid or delusional. He does not see them that way.”
Woods also testified about Zapisek’s resistance to following recommended medical regimes. Although a cardiologist had prescribed Coumadin for a serious heart problem, he refused to take it because of his concerns about it thinning his blood, and had been able to manage without it. On another occasion within six months prior to the hearing, he was observed putting olanzapine, his antipsychotic medication, in his pocket. He first denied having it, but then took the medication.
Woods also testified that Zapisek did not have an Axis II diagnosis, such as a personality disorder, the presence of which often raises the risk of danger. She stated that while she had not studied the specific issue, she suspected that individuals suffering from schizoaffective disorder, as a general class, absent any substance abuse history, most likely did not have a higher risk for violence than persons who did not have schizoaffective disorder.
Woods was also asked whether she would agree that “the overwhelming empirical data shows that those persons over 60 years old commit very few violent offenses.” She stated: “When you look statistically, you certainly find that more offenses are committed by younger adults than by older adults. Working on a geriatric unit, I’m unfortunately very aware that that’s not an adequate protective factor because we got so many people in who have committed offenses at an older age, but statistically, that’s absolutely correct.”
Woods was not aware of any incidents in which Zapisek was physically violent while at Napa State Hospital. She did not know of any incidents in which he has specifically threatened physical harm to anyone. She did not consider Zapisek to be psychopathic, which would make him a high risk. She also acknowledged that she did not use any actuarial instruments to determine Zapisek’s risk, although she did analyze Zapisek’s known risk factors.

*1157
Second Expert Witness for the People

Sarinder Auluck, a staff psychiatrist at Napa State Hospital, also testified as an expert witness for the People about the nature of Zapisek’s mental disorder, as well as his clinical judgment as to whether or not Zapisek was a danger to others. Auluck had dealt with risk assessment in the treatment context, although he did not have specific training in it. He had treated Zapisek for over 10 months prior to the hearing. He assessed Zapisek’s dangerousness based on his clinical presentation and the historical facts of his case, having reviewed records of Zapisek’s medical and criminal history. The court qualified him as an expert witness over Zapisek’s counsel’s objection as well.
Auluck testified that Zapisek suffered from an Axis I diagnosis of schizoaffective disorder, bipolar type. He believed that Zapisek currently represented a substantial danger of physical harm to others as a result of his mental disorder, in part because he continued to suffer from very much the same type of delusions and symptoms that he suffered from when he committed the 1997 criminal assault that led to his initial commitment. Auluck stated that Zapisek’s reality testing remained “extremely impaired,” and that he was “delusional and had evidence of paranoia.” He was not in remission. Zapisek had denied his delusions, had not completed the hospital’s mandated relapse prevention plan, did not “do well” in “an unsupervised environment,” and had not responded positively to various prescribed antipsychotic medications.
Auluck provided examples of Zapisek’s delusional and paranoid behavior. Zapisek was concerned that all of his actions were being recorded by a camera in the unit. Auluck had observed him talking to his radio, and Zapisek had told him in the past that he was freed by the Supreme Court, but that the President had fired the court. He further testified that Zapisek had said that the President and the FBI were after him. Auluck testified that the day before Zapisek was to leave the hospital to attend the petition proceedings, he covered vents at the hospital with cello tape because he thought they were cameras recording all of his actions. Auluck also testified that Zapisek was grandiose in his delusions, and had approached him several times saying he would write Auluck a check for $25 million if Auluck let him out of the unit.
Auluck stated that while all persons with delusions are not necessarily violent, some of them act on their delusions, and in Zapisek’s case “he very clearly did, historically.” Auluck noted that Zapisek’s records indicated he had a history of mental illness since the early 1980’s, had engaged in self-injurious behavior when he walked naked in a panic attack in New York City around 1981, was noticed walking on the Golden Gate Bridge against traffic in 1985, and appeared in court for a charge of battery in 1985, although *1158 the matter was not prosecuted. Auluck also testified that Zapisek had not been violent at the hospital. He was not aware of Zapisek physically threatening anyone there.

Zapisek’s Testimony

Zapisek was the only witness to testify on his behalf. He said that he suffered from mental illness which required medication, and that he took his prescribed medications voluntarily and would continue to do so.
Zapisek also testified that he believed, although it might be a delusion, that he had “inherited a great fortune of money.” He read a prepared statement, in which he asserted that he had appealed his case to the California Supreme Court, which had referred it to the United States Supreme Court. The case somehow infuriated the President, who fired, or tried to fire, the Supreme Court. He thought that President Bush was aware of him, and that “my close to coming out is probably on his mind and he’s started drinking again.” Zapisek denied that he ever said he would hurt the President.
Zapisek testified about his previous actions that endangered himself or others. He acknowledged that he had tried to kill himself in the past when he was destitute. Regarding the 1997 incident, Zapisek stated that he was “trained in passive resistance” and characterized it as “basically an accident, except I had the knife, so I took full responsibility for it.” He said he had been off his medication, and “went off the deep end” because he thought the man was the devil.
Zapisek also indicated that he would act in “self-defense” if necessary in the future, stating “if somebody’s coming after me, I have to defend myself somehow so that’s why I’ve hired guards—bodyguards.” When asked about taping over certain equipment at the hospital, Zapisek said he thought they were bugs, and that he was raised in a house that was bugged for sound.
After the hearing, the court found the extension petition proved beyond a reasonable doubt, and ordered Zapisek’s commitment extended until September 10, 2007. Zapisek subsequently filed a timely notice of appeal.
DISCUSSION
Zapisek contends there was no substantial evidence that he represented a substantial danger of physical harm to others, requiring that the trial court’s order extending his commitment be reversed. This is incorrect.
*1159 I. Legal Standards
Under section 1026.5, subdivision (b)(1), “[a] person may be committed beyond the term prescribed by subdivision (a) only under die procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.” At no less than 90 days before the term of commitment ends, the prosecuting attorney may file a petition for extended commitment in the superior court which issued the original commitment. (§ 1026.5, subd. (b)(2).) The person named in the petition has a right to be represented by an attorney and the right to a jury trial. (§ 1026.5, subd. (b)(3).) If, after trial, the court or jury finds the patient “by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others,” the patient will be recommitted for an additional period of two years from the date of termination of the previous commitment. (§ 1026.5, subd. (b)(8).)
Zapisek contends that as part of proving he represented a substantial danger of physical harm to others pursuant to section 1026.5, subdivision (b), the People were required to show that he had a serious difficulty controlling his potentially dangerous behavior, citing as support In re Howard N. (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (Howard N.) and People v. Galindo (2006) 142 Cal.App.4th 531 [48 Cal.Rptr.3d 241] (Galindo).[2] He argues that the People failed to present any such evidence, requiring reversal for this reason alone.
The People argue, contrary to the holding in Galindo, supra, 142 Cal.App.4th 531, and the Attorney General’s concession in that case (id. at p. 537),[3] that the trial court was not required to find that Zapisek had a serious difficulty controlling his potentially dangerous behavior in a section 1026.5, subdivision (b) proceeding and, in any event, that substantial evidence was presented to support such a finding.
We agree with Zapisek’s view of the showing required in a section 1026.5, subdivision (b) proceeding. We also agree with the People’s contention that substantial evidence was presented below showing that Zapisek had serious difficulty controlling his potentially dangerous behavior.
*1160 Galindo, supra, 142 Cal.App.4th 531, followed several years of court review of the due process rights of persons subject to civil commitment proceedings. The United States Supreme Court has repeatedly “recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.” (Addington v. Texas (1979) 441 U.S. 418, 425 [60 L.Ed.2d 323, 99 S.Ct. 1804].) Section 1026.5, subdivision (b), as well as other similarly worded commitment statutes, have been addressed in several cases before the United States Supreme Court and the California Supreme Court. The decisions in those cases establish the conditions in which a person may be civilly committed.
In Kansas v. Hendricks (1997) 521 U.S. 346, 371 [138 L.Ed.2d 501, 117 S.Ct. 2072] (Hendricks), the court found that the commitment provisions of the Kansas Sexually Violent Predator Act (Kansas Act) satisfied due process requirements. The commitment provision required that a person had been convicted of or charged with a sexually violent offense, suffered from a mental abnormality or personality disorder that made him or her likely to engage in predatory acts of sexual violence, and a finding of dangerousness either to one’s self or to others. (Hendricks, at p. 357.) The court noted that “[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as ‘mental illness’ or ‘mental abnormality.’ ” (Id. at p. 358.) These additional statutory requirements “limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.” (Ibid.)
Following Hendricks, supra, 521 U.S. 346, the California Supreme Court analyzed the commitment provision of the California Sexually Violent Predator Act (SVPA), Welfare and Institutions Code section 6600 et seq., in Hubbart v. Superior Court (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969 P.2d 584] (Hubbart). For commitment under the California SVPA, a “sexually violent predator” must suffer from “a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.” (Welf. & Inst. Code, § 6600, subd. (a)(1).) Like the Kansas Act, the California SVPA required a finding of dangerousness linked to a finding of “a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior.” (Hubbart, supra, 19 Cal.4th at p. 1158.) The court found that “due process requires an inability to control dangerous conduct, and does not restrict the manner in which the underlying impairment is statutorily defined.” (Ibid.) Because the commitment provision in the California SVPA was so similar to the provision upheld in the Kansas Act, the court also upheld the California SVPA commitment statute. (Hubbart, at p. 1157.)
*1161 The Kansas Act again came before the United States Supreme Court in Kansas v. Crane (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867] (Crane). The Kansas Supreme Court had interpreted Hendricks, supra, 521 U.S. 346, as requiring a dangerous individual to be completely unable to control his or her behavior before being civilly committed. (Crane, at p. 411.) The court disagreed, holding that “Hendricks set forth no requirement of total or complete lack of control. Hendricks referred to the Kansas Act as requiring a ‘mental abnormality’ or ‘personality disorder’ that makes it ‘difficult, if not impossible, for the [dangerous] person to control his dangerous behavior.’ ” (Ibid.) Furthermore, the court recognized “that in cases where lack of control is at issue, ‘inability to control behavior’ will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior.” (Id. at p. 413.)
After Crane, the California Supreme Court had another opportunity to review the California SVPA in People v. Williams (2003) 31 Cal.4th 757 [3 Cal.Rptr.3d 684, 74 P.3d 779]. In that case, the defendant had been committed under the SVPA. (People v. Williams, at p. 759.) The jury received instructions that did not include an instruction to find that the defendant had serious difficulty controlling his behavior. (Ibid.) However, the court found the language of the instruction “inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one’s criminal sexual behavior.” (Ibid.) Even if an instructional error had occurred, the court found the evidence presented at trial so overwhelming that “no rational jury could have failed to find he harbored a mental disorder that made it seriously difficult for him to control his violent sexual impulses.” (Id. at p. 760.) The lack of a “control” instruction was deemed harmless beyond a reasonable doubt. (Ibid.)
Two years later, the California Supreme Court considered whether the extended detention scheme under Welfare and Institutions Code section 1800 et seq., violated due process because it did not expressly require a finding that the person’s mental impairment caused serious difficulty in controlling behavior. (Howard N., supra, 35 Cal.4th at p. 122.) The commitment statute at issue in Howard N. authorized extended detention of dangerous persons who are under the control of the department of Youth Authority, and was very similar to section 1026.5, subdivision (b)(1) as they both contained a requirement of physical dangerousness to the public and mental deficiency, disorder or abnormality.[4] The court concluded that the extended detention scheme under Welfare and Institutions Code section 1800 “should be interpreted to contain a requirement of serious difficulty in controlling dangerous *1162 behavior.” (Howard N., at p. 132.) The court further explained, “we can preserve the constitutionality of the extended detention scheme by simply interpreting the scheme to require not only that a person is ‘physically dangerous to the public because of his or her mental. . . deficiency, disorder, or abnormality,’ but also that the mental deficiency, disorder, or abnormality causes him to have serious difficulty controlling his dangerous behavior. This aspect of the person’s condition must be alleged in the petition for extended commitment (§ 1800), and demonstrated at the probable cause hearing (§ 1801) and any ensuing trial (§ 1801.5).” (Id. at p. 135.)[5]
The following year, after the proceedings below in this matter, the Third District determined that the requirements stated in Howard N., supra, 35 Cal.4th 117, applied to section 1026.5, subdivision (b) extension of commitment proceedings. In Galindo, supra, 142 Cal.App.4th 531, Galindo was originally committed under section 1026 for the felony of possession of a firearm by a convicted felon. (Galindo, at p. 533.) The People petitioned to extend his commitment for two years, which the court ordered after a court trial. (Ibid.) On appeal, the Attorney General conceded that following Howard N., section 1026.5, subdivision (b)(1) “must be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior.” (Galindo, at p. 533.) After reviewing the relevant statutes and Howard N., the court accepted the Attorney General’s concession. (Galindo, at p. 537.) The court found that Galindo’s behavior was such that reversal was required. The court found “abundant evidence that defendant’s behavior was dangerous and that he did not, in fact, control it.” (Id. at p. 539.) The court nonetheless reversed the court’s ruling and remanded the matter for further proceedings, explaining: “[T]he fact [that the defendant] did not control his behavior does not prove that he was unable to do so, thus making him ‘dangerous beyond [his] control.’ (Howard N., supra, 35 Cal.4th at p. 128.) There was little, if any, evidence that he tried to control his behavior, that he encountered serious difficulty when trying to do so, or that his difficulty was caused by his mental condition. Rather, the evidence *1163 strongly suggested that defendant did not try to control his dangerous behavior, because he perceived no reason to do so.” (Galindo, at p. 539.)
The Fifth District followed Galindo, supra, 142 Cal.App.4th 531, in People v. Bowers (2006) 145 Cal.App.4th 870 [52 Cal.Rptr.3d 74] (Bowers). Bowers had been found not guilty by reason of insanity of two counts of battery on correctional officers and committed to the Department of Mental Health for a maximum period of incarceration of four years. (Bowers, at p. 872.) A petition for extended commitment pursuant to section 1026.5, subdivision (b) subsequently was filed, jury trial waived, and the matter submitted on the reports of two expert witnesses. (Bowers, at pp. 872-873.) The trial court found the petition allegations true and that by reason of mental disease, defect or disorder, Bowers represented a substantial danger of physical harm to others, and extended her commitment for two years. (Id. at p. 873.) The appellate court first considered how to construe the requirements of section 1026.5, subdivision (b). After reviewing the holdings in Howard N., supra, 35 Cal.4th 117, and Galindo, supra, 142 Cal.App.4th 531 (Bowers, at pp. 877-878), the court stated: “We agree with the Galindo court that given the similarity between section 1026.5 and Welfare and Institutions Code section 1800 et seq., section 1026.5, subdivision (b)(1) should be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior, and therefore accept the People’s concession that this interpretation is required here.” (Bowers, supra, 145 Cal.App.4th at p. 878; see also People v. Bailie (2006) 144 Cal.App.4th 841, 847-850 [50 Cal.Rptr.3d 761] [applying the due process standards stated in Howard N. and Galindo to Welf. & Inst. Code, § 6500 commitments involving mentally retarded persons].)[6]
The People urge us to ignore Galindo, supra, 142 Cal.App.4th 531, contending that it contains no analysis of why Howard N., supra, 35 Cal.4th 117, applies to section 1026.5, subdivision (b) proceedings, and “rests on a concession by the People based on a similarity in statutory language.” The People distinguish between insanity recommitment for a “cognitive” disorder such as Zapisek’s,[7] versus civil recommitments for volitional disorders such *1164 as was the case in Howard N., arguing that Howard N. does not apply to the former. It notes that section 1026.5, subdivision (b)’s “phrase ‘mental disease, defect or disorder’ does not encompass the mental conditions of recidivists or sociopaths.” (People v. Wilder (1995) 33 Cal.App.4th 90, 101 [39 Cal.Rptr.2d 247].) It has been held that “[b]y requiring the prosecution to prove dangerousness because of mental disease, defect, or disorder, section 1026.5, subdivision (b) assures that the extended commitment bears a reasonable relation to the purpose of commitment,” as required by law. (Ibid.)
The People’s argument is unpersuasive. The court in Galindo, supra, 142 Cal.App.4th 531, as well as in Bowers, supra, 145 Cal.App.4th 870, did not merely adopt the approach conceded by the Attorney General. They each reviewed the relevant statutes and the analysis provided in Howard N., supra, 35 Cal.4th 117, in the course of accepting the concession. (Galindo, at pp. 536-537; Bowers, at p. 878.) Moreover, the case law leading up to Galindo and Bowers is primarily concerned with the due process rights of mentally ill persons in civil commitment proceedings, and is not limited to volitional disorders.[8] For example, our Supreme Court in Howard N., although relying heavily on two United States Supreme Court cases involving sexually violent predator statutes, Hendricks, supra, 521 U.S. 346, 371, and Crane, supra, 534 U.S. 407, specifically noted that “nothing in the language of these high court cases indicates that the lack of control requirement is limited to the sexually violent predator context.” (Howard N., supra, at p. 131.) The Howard N. court continued: “Indeed it is difficult to imagine on what basis the high court could articulate different due process standards for the civil commitment of dangerous mentally ill persons who happen to be sexually violent predators than for those dangerous mentally ill persons who are not sexually violent predators. Thus ... its constitutional pronouncements are instructive here.” (Ibid.)
Similarly, the United States Supreme Court in Crane, supra, 534 U.S. 407, in the course of discussing “emotional” and “volitional” sexually related mental abnormality, stated: “Here, as in other areas of psychiatry, there may be ‘considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior.’ American Psychiatric Association Statement on the Insanity Defense, 140 Am. J. Psychiatry 681, 685 (1983) (discussing ‘psychotic’ individuals). Nor, when considering civil commitment, have we ordinarily distinguished for constitutional purposes *1165 among volitional, emotional, and cognitive impairments.” (Id. at p. 415.) Moreover, as the People concede, while the extended commitment must bear a reasonable relation to the purpose of commitment, “[d]ue process does not require that the standard for legal insanity and the standard for extension of commitment for an insanity acquittee be identical.” (People v. Wilder, supra, 33 Cal.App.4th at p. 100.)
In short, in light of this analysis and precedent, we conclude that we can only affirm Zapisek’s commitment extension if we find substantial evidence that he had, at the very least, serious difficulty controlling his potentially dangerous behavior.
II. Substantial Evidence in Support of the Commitment Extension
Zapisek next contends that the trial court’s recommitment order is not supported by substantial evidence that he had a mental disease, defect, or disorder that caused serious difficulty in controlling his dangerous behavior. This is incorrect.
“ ‘ “Whether a defendant ‘by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others’ under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.” [Citation.] “In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]” [Citation.]’ [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant’s commitment under section 1026.5. [Citation.]” (Bowers, supra, 145 Cal.App.4th at pp. 878-879.)
At the extension hearing, the only expert witnesses testifying were Woods and Auluck, who had engaged with Zapisek at Napa State Hospital and were familiar with his history. Their testimony made clear that Zapisek has more than serious difficulty controlling his potentially dangerous behavior; he has little, if any, control over potentially dangerous behavior when he is gripped by delusions and paranoia. There was uncontroverted expert testimony that Zapisek suffered from a schizoaffective disorder, bipolar type, which, among other things, caused him to suffer delusions that he wholeheartedly believed, that his reality testing remained “extremely impaired,” that he also was paranoid, that he denied at least some of his delusions and paranoia, had not completed the hospital’s mandated relapse prevention plan and, on at least *1166 one occasion, had only pretended to take his prescribed medication. The experts provided multiple examples of Zapisek acting in inappropriate ways because of his delusions, such as taping alarm sensors needed for medical emergencies because he believed he was under surveillance, taking steps to escape from the hospital for fear that workmen would return to harm him, or aggressively insisting on money he believed he was owed. The expert testimony also indicated that Zapisek was not in remission, that his delusions continued despite his treatment with a variety of antipsychotic medications, and that he was likely to deteriorate in an unstructured environment outside the hospital. Most importantly, the experts agreed that Zapisek’s delusions were of the same type as those he experienced when he committed the 1997 assault.
Zapisek’s own testimony regarding his great inheritance, and his insistence on reading a prepared statement that referred to the firing of the Supreme Court for their handling of his case and President Bush’s awareness of his impending release made clear that Zapisek continued to believe in his delusions and paranoia, and act on them.
Furthermore, there was evidence that Zapisek has acted in ways dangerous to others or himself based on his mental illness and continuing symptoms. The 1997 incident itself was the strongest proof of his inability to control dangerous behavior in the face of a delusion. In addition, Auluck testified that Zapisek had been involved in other incidents dating back to 1980, and Zapisek himself acknowledged that he previously tried to kill himself.
Thus, it is clear that at the time of the hearing, Zapisek continued to believe wholeheartedly in delusions and experience paranoia he cannot control, both of which are of the type that has led him to act violently in the past, and which cause him to act inappropriately, including so as to pose a danger to others. In short, substantial evidence was presented below that Zapisek has, at the very least, serious difficulty controlling potentially dangerous behaviors,[9] as well as substantial evidence that Zapisek otherwise represents a substantial danger of physical harm to others.
*1167 Zapisek argues that such a conclusion is incorrect for a variety of reasons. He first argues that he did not represent a substantial danger of physical harm to others, and points to the evidence that he had not been involved in any incidents resulting in physical harm to others in the eight years he has been hospitalized, that he did not physically harm anyone prior to the 1997 assault, and that no one was physically harmed by his acting upon his delusions while in the hospital. He concludes, “it appears that the assault [Zapisek] committed—though both serious and related to his continuing mental disorder—was an aberration, a single dangerous episode not indicative of a substantial risk of danger of physical harm to others if he were released from the hospital.” He contends the evidence of his dangerousness is similar to that of the defendant in In re Anthony C. (2006) 138 Cal.App.4th 1493 [42 Cal.Rptr.3d 370], in which the Third District reversed an extended commitment order because it found that no rational trier of fact could have found beyond a reasonable doubt that the defendant had serious difficulty controlling his sexually deviant behavior, in part based on the evidence that the defendant did not act on his sexual fantasies in an inappropriate manner during his confinement. (Id. at p. 1508.)
Zapisek next argues that there was no evidence that he had a serious difficulty controlling his potentially dangerous behavior, contending that he “did not act on his delusions in an inappropriate manner that caused or was likely to cause physical harm to others during his confinement,” and referring again to the evidence that he harmed no one other than the victim in the 1997 assault. He contends that the court’s ruling was based on expert opinions which “amounted to nothing more than mere speculations regarding future dangerousness.”
Zapisek further argues that his acting out while in the hospital cannot be a basis for extending his commitment. For example, he contends that the medical emergency caused by his taping of alarm sensors was “attenuated,” that his effort to escape the hospital because of his fear of the workmen actually showed that he had the ability to control his potentially dangerous behavior because he was trying to extricate himself from the situation, and that there was no evidence that he ever intended to harm President Bush.
Defendant cannot take any comfort from In re Anthony C., supra, 138 Cal.App.4th 1493. In that case, the court noted that the prosecution’s expert witness’s failure to prepare a formal risk assessment evaluation, lack of preparation, and his reluctance to state the risk factor at trial and to quantify *1168 how high a risk Anthony C. posed without further study “strongly suggested] his opinion was based as much on guesswork, surmise or conjecture as on relevant probative facts.” (Id. at p. 1507.) The court also indicated its belief that the minor’s sexual offenses, which led to his commitment, were “crimes of opportunity rather than of compulsion.” (Id. at p. 1508.) Furthermore, the court, while noting that Anthony C. had not acted out inappropriately during his confinement, also stated that this failure “may not be relevant to affirmatively establish he had impulse control” before concluding that it “leaves an evidentiary gap whether he lacked control.” (Ibid.) The court’s discussion of the expert testimony, Anthony C.’s condition at the time he committed the relevant crimes and his failure to act out during his confinement stand in sharp contrast to the circumstances of the present case. The experts testifying below were familiar with Zapisek, had reviewed his file and considered his risk, were definitive in their opinions and provided specific examples of his acting out inappropriately while in confinement, and testified that he continued to suffer from delusions of the same type that he experienced when he assaulted a stranger he believed was the devil in 1997.
Indeed, the facts of the present case are far more similar to the facts in Bowers, supra, 145 Cal.App.4th 870, in which experts testified that Bowers suffered from schizoaffective disorder, had an unstable condition, had a history of assaultive behavior towards others, had attempted suicide while in confinement, and continued to experience auditory hallucinations which commanded her to hurt herself or others. (Id. at p. 879.) Although Zapisek’s delusions do not command him directly to commit acts of violence, the court was entitled to rely on the expert testimony that he continued to act inappropriately based on delusions of the type he experienced in 1997, including in ways that could harm others, such as when he taped over hospital alarm sensors needed for medical emergencies.
We agree with Zapisek that, as stated in People v. Williams (1988) 198 Cal.App.3d 1476 [244 Cal.Rptr. 429] regarding section 1026.2 proceedings, “[a]n individual’s present condition is the focus of a commitment proceeding, not his or her behavior under future changes.” (People v. Williams, at p. 1481.) However, Zapisek’s contentions that his 1997 assault was an “aberration,” that the testifying experts were merely speculating about what he might do in the future, and that his delusional actions while in the hospital did not pose any danger are not supported by the record. As discussed herein, there was substantial evidence that at the time of the hearing Zapisek suffered from mental illness that caused him to engage in potentially dangerous behavior over which he had little, if any, control, and that he represented a substantial danger of physical harm to others.
*1169 DISPOSITION
The trial court’s order is affirmed.
Kline, P. J., and Haerle, J., concurred.
Appellant’s petition for review by the Supreme Court was denied May 9, 2007, S151482.

 All subsequent statutory references are to the Penal Code unless otherwise indicated.

 Galindo, which applied the holding of Howard N. to section 1026.5, subdivision (b) proceedings, was published after Zapisek filed his opening brief in this appeal. It was first raised by the People in their respondent’s brief, and then relied upon by Zapisek in his reply brief.

 The People are represented here by the Attorney General as well. Zapisek does not raise any issues regarding the Attorney General’s prior concessions such as judicial estoppel. Therefore, we consider the arguments on their merits.

 California’s Welfare and Institutions Code section 1800 was amended on July 21, 2005, to include the additional element. It now reads, in pertinent part, “Whenever the Division of Juvenile Facilities determines that the discharge of a person .. . would be physically dangerous *1162 to the public because of the person’s mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior . . .

 Soon after Howard N. was decided, the Court of Appeal addressed the same commitment statute in In re Michael H. (2005) 128 Cal.App.4th 1074 [27 Cal.Rptr.3d 627]. In that case, the juvenile court had ordered the defendant’s commitment extended for two years after a court trial. (Id. at p. 1079.) However, the petition seeking to extend the defendant’s commitment did not contain allegations that the potential committee’s mental deficiency, disorder, or abnormality caused him serious difficulty in controlling his behavior, nor was this demonstrated at the probable cause hearing. (Id. at p. 1091.) As a result, the court reversed the order of commitment and remanded the case to the juvenile court. (Ibid.) Zapisek has not raised any issues in the present case regarding the petition, which does not contain a separate allegation that he would have serious difficulty controlling his dangerous behavior. Therefore, we do not consider the issue further.

 The court declined to follow the argument put forward by Bowers, conceded by the People, that section 1026.5, subdivision (b) should be construed as also allowing commitment extension if the person’s mental disease, defect or disorder “seriously affects his or her capacity to properly perceive or process reality.” (Bowers, supra, 145 Cal.App.4th at p. 878, fn. 4.) The court noted that the argument was based on the reasoning in a case that had been ordered not published by our Supreme Court pending the appeal. (Ibid.)

 As the People note in their discussion of Zapisek’s “cognitive” disorder, CALJIC No. 4.00 states: “A person is legally insane when by reason of mental disease or defect [he] was incapable ... of one of the following: [][] 1. Knowing the nature and quality of [his] act; or [f] 2. Understanding the nature and quality of [his] act; or [][] 3. Distinguishing what is legally right from what is legally wrong” at the time of the commission of the crime. “The defendant *1164 has the burden of proving legal insanity at the time of the commission of [the] crime by a preponderance of the evidence.” (CALJIC No. 4.00; see also People v. Coddington (2000) 23 Cal.4th 529, 608 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overrruled on other grounds in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].)

 Section 1026.5, subdivision (b) proceedings, “though they include many constitutional protections relating to criminal proceedings, are essentially civil in nature.” (People v. Wilder, supra, 33 Cal.App.4th at p. 99.)

 Although the thrust of Zapisek’s argument is that no substantial evidence was presented to support a finding that he had serious difficulty controlling potentially dangerous behavior, he also asserts in his reply brief that the court’s extension of his commitment in the absence of such evidence constituted prejudicial error, quoting discussion in Howard N., supra, 35 Cal.4th at page 138, regarding the trial court’s failure to properly instruct the jury. This argument makes little sense because the proceedings in this case were before the court, not a jury. To the extent Zapisek intends by his brief argument that the court somehow erred because it did not expressly find he had serious difficulty controlling potentially dangerous behavior, and assuming for the sake of argument that such a failure constituted error, we conclude that based on the evidence presented, no rational trier of fact “ ‘could have failed to find [Zapisek] harbored a mental disorder that made it seriously difficult for him to control’ ” his potentially dangerous behavior, thereby rendering any error “ ‘harmless beyond a reasonable doubt.’ ” *1167 (Ibid.; see Bowers, supra, 145 Cal.App.4th at p. 879 [similarly concluding an error was harmless in light of the evidence].)