Filed 1/28/26  P. v. White CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086311 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. SCE244585, SCE266537) |
| JERMANE TERRELL WHITE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Daniel B. Goldstein, Judge.  Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

MEMORANDUM OPINION

Jermane Terrell White appeals from an order recommitting him to Atascadero State Hospital (ASH) until May 7, 2026, based on the jury's true finding by proof beyond a reasonable doubt that he is an offender with a

mental health disorder (OMHD).[1]  (Pen. Code,[2] §§ 2970, 2972.)  White concedes he has a severe mental health disorder that is not in remission or that cannot be kept in remission without treatment.  (§ 2972, subd. (c).)  He contends, however, that no substantial evidence supports the jury's finding he posed "a substantial danger of physical harm to others" (*ibid.*) because he has not engaged in any violence or aggression for about the last six years.  We affirm the trial court's June 30, 2025 recommitment order.

## I.

### *Background*

White was 44 years old at the time of his recommitment trial.  He has been a patient at ASH since January 2010.  Before his commitment, he served a two-year sentence in state prison.

White's first qualifying offense occurred in 2004, when he pled guilty to petty theft with a prior, after he refused to pay for a cup of coffee, demanded a pack of cigarettes, and told a convenience store employee he had a gun.  (§§ 484 & 666.)  The second offense took place in 2006 while he was on probation, when he punched a convenience store employee in the mouth.  For that offense, the jury convicted him of robbery (§ 211) and petty theft with a prior (§§ 484 & 666).

---

[1]  "OMHD prisoners 'were previously described as mentally disordered offenders, or MDO's.  The Legislature recently changed this terminology to "offender with a mental health disorder." ' "  (*People v. McCray* (2023) 98 Cal.App.5th 260, 264, fn. 1 (citation omitted); Stats 2019, ch. 9, § 6, eff. Jan. 1, 2020.)  For convenience, we use the "OMHD" acronym throughout this opinion.

[2]  All further statutory references are to the Penal Code.

In early January 2025, the People filed a petition to extend White's OMHD commitment. White's first trial ended in a mistrial. On retrial in June, the jury returned a true finding on the petition.

On June 23, 2025, White filed an appeal from the trial court's minutes of June 18 memorializing the true finding.[3] On June 30, the court entered an order extending White's commitment to May 7, 2026, and requiring that White be assessed for placement in the state's Conditional Release Program (CONREP) administered by the State Department of State Hospitals.

## II.

### *Discussion*

White contends no substantial evidence supports the jury's dangerousness finding because he has not been "violent or aggressive" for about six years. We disagree.

Enacted in 1985, the OMHD statutory scheme "requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission." (*In re Qawi* (2004) 32 Cal.4th 1, 9 (*Qawi*), citing § 2960 et seq.) "[T]he purpose of the scheme is to provide [OMHD's] with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder." (*Qawi*, at p. 9.)

---

[3] We exercise our discretion and treat the appeal from the trial court minutes of June 18, 2025 as having been taken from the court's June 30, 2025 order. (See Cal. Rules of Court, rule 8.104(d)(2); *Majestic Asset Management LLC v. The Colony at California Oaks Homeowners Assn.* (2024) 107 Cal.App.5th 413, 422, fn. 3 [this court treated a "premature notice of appeal as having been taken from a subsequent appealable order"].)

Recommitment of OMHD patients is governed by sections 2970 and 2972.  The OMHD permits a district attorney, on the recommendation of medical professionals, to petition to recommit an offender as an OMHD for continued involuntary treatment.  (§ 2970, subd. (b).)  The standard of proof for a section 2970 petition is beyond a reasonable doubt.  (§ 2972, subd. (a)(2).)  "If the court or jury finds that the patient has a severe mental health disorder, that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed," for a one-year period from the date of the previous commitment.  (*Id.*, subd. (c).)

Section 2962, subdivision (g), does not define "substantial danger of physical harm," other than providing it "does not require proof of a recent overt act."  The California Supreme Court in *Qawi* instructed that "[i]n context, it appears to mean a prediction of future dangerousness by mental health professionals."  (*Qawi, supra*, 32 Cal.4th at p. 24; accord, *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 ["A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment."].)

The prosecution presented the testimony of three experts at White's June 2025 recommitment trial:  (1) Robert Zeszotarski, a psychiatrist at ASH who first treated White in 2012, and resumed treating him in December 2024 for schizoaffective disorder, bipolar type; (2) Brenna Giordano, a licensed psychologist and forensic evaluator at ASH; and (3) Nicole Friedman, also a

licensed psychologist appointed by the trial court to separately evaluate White.

Dr. Zeszotarski prescribed two psychotropic medications that White has taken daily for the last couple of years. Due to "medical reasons," White's dosage for one of those medications was "almost at the maximum" and for the other was "pretty high." In addition to taking daily psychotropic medications, White also took several "PRN"[4] medications, mostly for agitation and anxiety.

At the time of trial, White was subject to a court-ordered involuntary medication order (also known as a *Qawi* order), which he has been on for years. Dr. Zeszotarski recently applied to renew the *Qawi* order because (1) White did not believe he has a "serious mental illness" and (2) when given the chance not "long ago" to voluntarily take his medication, "he didn't last very long before he started to refuse again."

Dr. Zeszotarski opined that without psychotropic medications, White's symptoms "would absolutely get worse," as he would become "more delusional potentially" and "his thought disorganization would worsen," and he "probably" would become "more aggressive."

Dr. Giordano opined that White remained a substantial danger of physical harm to others as a result of (1) being actively symptomatic; (2) his failure to recognize he suffers from a severe mental disorder; (3) his having been subject to a *Qawi* order for years; (4) his belief he did not need

---

4 PRN, or "pro re nata" in Latin, means "as needed, as the circumstances require." (See Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/prn> [as of Jan. 13, 2026], archived at <[https://perma.cc/CPF3-QUXT]>.)

medication and it purportedly did not help him; and (5) his lack of a discharge plan to prevent a relapse once released from ASH.

Based on a combination of these factors, Dr. Giordano further opined (1) White would likely not seek treatment for his illness once released from ASH; (2) over time, his symptoms would likely become worse; and (3) as a result, his "risk for violence" would increase related to those symptoms. Dr. Giordano relied on White's past criminal behavior and his "many" incidents of violent behavior at ASH, including in 2019 when he became "hostile" with staff and "assaulted peers," to support her opinion.

In addition to reviewing probation reports and hospital records, Dr. Friedman interviewed White for about 25 minutes in May 2025 in a video conference. She opined that White should be recommitted to ASH.

During the interview, White denied having a mental illness. He claimed there was no reason for him to be a patient at ASH and staff "forced" him to take medication. Like Dr. Giordano, Dr. Friedman opined that White lacked "insight into [his] mental illness in terms of understanding how the medications do help him." And he posed a substantial danger of physical harm to others based on his "noncompliance with treatment" and his lack of a "viable discharge plan," which increased his "risk of recidivism" and "aggression towards others."

We conclude the experts' testimony provides ample evidence to support the jury's finding by proof beyond a reasonable doubt that White posed a "substantial danger of physical harm to others" if released into the community. (§ 2972, subd. (c).) Each expert noted White's lack of insight into his need for medication and continued treatment, despite the fact he remained highly symptomatic and displayed the same severe symptoms that led him to commit the underlying offenses.

6

The record also shows White believed others were trying to kill or harm him. He testified there were "snipers in the hills" outside of ASH and he "occasionally ma[de] a bulletproof vest or a helmet or bulletproof glass to make sure the bullets [didn't] hurt [him]." White also testified he was being "drugged" at ASH because the "whole unit" wanted to sexually assault him at night; adding, it was "[a]ll of them versus me." He also believed the "guy at parole" put an "alien parasite in [his] stomach" that was "getting big" and becoming "really serious."

The evidence of White's belief that others were trying to kill or hurt him, even while on daily psychotropic medications and with the availability of PRN medications, further supports the jury's dangerousness finding. White testified he took these medications "against [his] will" and wanted off them because they made him "really, really, really docile." A reasonable inference from this evidence is that over time, with little to no medication, White would become less "docile" and, acting on the need to protect himself, would become more aggressive as his symptomology increased. (See *People v. Clark* (2000) 82 Cal.App.4th 1072, 1082 [in considering the sufficiency of the evidence to support a jury's OMHD findings, we must consider "the evidence in the light most favorable to the People, . . . drawing all inferences the trier could reasonably have made to support the finding"].)

White, however, contends the jury's dangerousness finding is unsupported because he has not been involved in any incidents of violence or aggressiveness since 2019. But a finding of "substantial danger of physical harm" to others does not require "proof of a *recent* overt act." (§ 2962, subd. (g), italics added.)

White also relies on what he calls Dr. Zeszotarski's "dam[n]ing testimony" regarding the doctor's lack of concern about White's current

dangerousness. We note, however, that Dr. Zeszotarski clarified on redirect that his testimony was "within the context of [White's] *current* treatment" as an inpatient at ASH, where White received daily, high doses of psychotropic medications and had access to medication for agitation and anxiety on an as-needed basis. (Italics added.) As noted, Dr. Zeszotarski also testified that without these medications, White's symptoms "would absolutely get worse" and he "probably" would become "more aggressive."

In sum, the record contains more than sufficient evidence to support the jury's dangerousness finding based on the experts' testimony, including from Dr. Zeszotarski.

Finally, the authorities White relies on are distinguishable from the present case, and therefore do not change our analysis. (See e.g., *People v. Jenkins* (2023) 95 Cal.App.5th 142, 153 [we concluded the jury's dangerousness finding was unsupported by the evidence because at the time of the OMHD hearing, the defendant was 70 years old and suffered from significant medical issues and decreased mobility, and because her last violent act had occurred decades earlier]; *People v. Cheatham* (2022) 82 Cal.App.5th 782, 786–788 [insufficient evidence of dangerousness to extend commitment under section 1026.5 because the defendant "never once engaged in behavior dangerous to others because of his mental disorder" and testified he would continue taking medication once released because it helped him manage his symptoms]; *People v. Johnson* (2020) 55 Cal.App.5th 96, 109 [insufficient evidence of dangerousness because the 69-year-old defendant had not engaged in violence since 1990, when he committed the qualifying offense, and committed no acts of violence for 11 years while released in the community under CONREP supervision].)

### III.

### *Disposition*

We affirm the trial court's June 30, 2025 order, extending White's commitment to May 7, 2026.

DO, J.

WE CONCUR:


DATO, Acting P. J.


CASTILLO, J.