Filed 9/29/15  P. v. Lang CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075050 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F02105) |
| v. | |
| THOMAS LANG, JR., | |
| Defendant and Appellant. | |

Defendant Thomas Lang, Jr., appeals from an order extending his mental health commitment for two years to March 1, 2015.  He contends there was no substantial evidence to support the findings he is dangerous by reason of a mental disorder, he lacks the volitional capacity to control his dangerous behavior, or he would be dangerous if supervised under the conditional release program (CONREP).  We disagree with all of defendant's contentions and affirm the order.

1

FACTUAL AND PROCEDURAL HISTORY

A petition filed August 24, 2012, pursuant to Penal Code section 1026.5, subdivision (b), alleged that in 2006, defendant was found not guilty by reason of insanity of committing attempted murder and battery with serious bodily injury.[1]  On January 12, 2007, the court committed defendant to Napa State Hospital (Napa) pursuant to section 1026.  Defendant's commitment was set to expire on March 1, 2013.  The petition alleged that defendant suffered from a mental disease, defect, or disorder and, as a result, represented a substantial danger of physical harm to others.  In support of the petition, the prosecutor attached an affidavit by Patricia Tyler, M.D., Medical Director of Napa, who declared that defendant qualified for an extension of his commitment under section 1026.5.  Dr. Tyler attached a July 31, 2012, evaluation (evaluation) describing defendant's treatment and behavior during commitment to support her opinion.

On August 20, 2013, defendant waived his right to a jury trial.

By letter dated January 28, 2013, defendant requested that the court consider placing him in CONREP.

At a bench trial, the prosecutor introduced the testimony of an expert witness, Charles Kepner, Ph.D., a clinical psychologist at Napa, and the evaluation of defendant signed by Dr. Kepner as well as Daniel Bleman, M.D., a staff psychiatrist at Napa.  The evaluation was also signed by Dr. Tyler who reviewed the evaluation.

Dr. Kepner had been a clinical psychologist at Napa since 1984.  He testified as an expert in the field of psychology and as a person qualified to render an opinion as to the criteria under section 1026.5.  Dr. Kepner was a member of defendant's treatment team and had been personally involved in defendant's treatment since August 2009.  He authored the evaluation which recommended the extension of defendant's commitment.

---

[1]    Further undesignated section references are to the Penal Code.

Dr. Kepner opined that defendant suffered from a mental disorder, specifically schizophrenia, a life-long chronic condition. Defendant's major symptom is paranoia. He also has auditory hallucinations. Defendant was prescribed Prolixin Decanoate, an antipsychotic medication which he received by injection every other week. Oral medication had proven to be ineffective in controlling defendant's symptoms. Dr. Kepner noted that in late 2010, defendant "had to go back to what is called a locked unit for some months. We couldn't manage him, and he was paranoid towards staff." Also, for a couple of weeks in July 2011, defendant had significant paranoia when his medications were being adjusted.

The evaluation noted that defendant had "[r]ecently . . . presented mild paranoid ideations in the form of having feelings of 'not trusting anyone.' He could not identify any specific person but feelings of mild paranoia. He admits to the delusional beliefs which he had at the time of the [commitment] offense." The evaluation also stated, "Although the paranoid and delusional thinking have lessened through treatment, [defendant] does not yet have a full appreciation and acknowledgement of the severity of his offense including knowing his precursors of danger and does not as yet have the ability to sustain his ongoing need for treatment if released into the community. These factors continue to make him a danger to the community."

The evaluation noted that defendant's "ability to recognize the precursors of his illness at the time that he is experiencing them and his potential for danger is considered to be limited, however. He does not fully recognize his warning signs so that he can identify them and seek help and follow through on it before he becomes a danger to the community. In our estimation, he still does not have a[n] understanding of his potential for danger and of the precursors of his dangerous/criminal behavior, including his instant offense."

Since writing the evaluation, Dr. Kepner believed that defendant had done "relatively well." Defendant attended and participated in group treatment sessions and

3

was medication compliant.  Defendant had "some" insight into his mental disease and understood his need for medication to control it.

Dr. Kepner believed defendant, as a result of his mental disease, posed a substantial danger to others outside the hospital and had serious difficulty in controlling dangerous behavior.  Dr. Kepner relied upon his personal observations from treating defendant, information provided to him by other treating mental health professionals at Napa, and defendant's medical records.

In forming his opinions, Dr. Kepner also considered the underlying facts of defendant's commitment offense.  Defendant had been in treatment for a mental disorder for many years and had been taking psychotropic medication.  Approximately two weeks before the offense, defendant stopped taking his medication and started to drink alcohol heavily.  On the day of the offense, defendant felt sick, was delusional, and, as defendant reported, "psychotic."  Believing his wife was mistreating their daughter and that his wife planned to use cleaning supplies to kill their daughter, defendant stabbed his wife multiple times.  Defendant reported that at the time of the stabbing, he heard "an identifiable female voice using his childhood name -- nickname Bubba," saying that "she's making a fool out of you, and don't do this."  Defendant also thought "the Japanese fighting fish that they had were turning into monsters."  Defendant became totally paranoid and was afraid to walk out of the house.

Defendant's well-documented history of psychiatric problems began at 17 years of age.  He experienced numerous symptoms of paranoia and auditory hallucinations.  He also had a long history of abusing alcohol.

In the evaluation, the doctors noted that defendant "minimizes and denies the severity of his mental illness at the time of [the commitment] offense and the contribution his alcohol dependence had in exacerbating his symptoms."  Defendant "underestimated and minimized his alcohol use.  He stated that he is a 'social drinker,' however, there are reports that when he drinks it will be a 'fifth at a time.' "  Alcohol use reduced the

4

effectiveness of defendant's antipsychotic medication and could trigger a relapse in his treatment. Dr. Kepner was concerned that defendant would abuse alcohol upon release from the hospital and into the community.

The then 64-year-old defendant testified that he was first diagnosed with schizophrenia when he was 20 or 21 years of age. His symptoms include paranoia and auditory hallucinations, explaining, "Sometimes--sometimes I get paranoid. Sometime seem like things are happening that don't be happening . . . ." (*Sic*.) He admitted that when he did not take his medication he sometimes felt paranoid and experienced delusions. His medications included Prolixin for schizophrenia, eye drops for glaucoma, and Congentin for "side effects." Defendant believed he had to take his medication, explaining, "Seem like that's only way I can get out the hospital." (*Sic*.) If released from the hospital, he claimed he would continue with his medication because he did not want his symptoms to recur. He admitted that he had stopped taking Prolixin when living in the community and he became paranoid, explaining, "I got scared to go outside the door, and, plus, people was playing games with me -- playing games on me" and "trying to work voodoo magic and all like that." (*Sic*.) He had been going to a clinic voluntarily but quit going and "had a couple of beers."

When asked if he needed to take his medications to control his dangerous behavior, defendant responded that he currently did not have dangerous behavior and that his symptoms were "in remission." When asked if he needed to take medications to keep his symptoms in remission, he responded, "Sometimes I do but I take it anyway [be]cause the doctor tell[s] me to take your meds. You have a mental problem." When asked if he believed his doctors, defendant responded that he believed his psychiatrist but not Dr. Kepner. When asked whether his symptoms caused him to be violent, defendant responded, "No. Not all the time. Unless I'm agitated or somebody just agitating me [be]cause they're agitating me." (*Sic*.)

5

If released from the hospital, defendant claimed he would go to a clinic for his medication, participate in Alcoholics Anonymous and Narcotics Anonymous, and comply with any requirements to stay in the community. He claimed he could live with family members or at least he "hope[d] so."

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports the extension of his commitment, arguing that the evidence did not prove he is dangerous by reason of a mental disorder or that he lacks the volitional capacity to control his dangerous behavior. We disagree.

" ' "In reviewing the sufficiency of the evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.]" (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878-879 (*Bowers*).)

"A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*Bowers, supra*, 145 Cal.App.4th at p. 879.)

A defendant's commitment can be extended only if "by reason of a mental disease, defect, or disorder, [the defendant] represents a substantial danger of physical harm to others" (§ 1026.5, subd. (b)(1)), and the defendant has "serious difficulty in controlling his dangerous behavior." (*In re Howard N.* (2005) 35 Cal.4th 117, 132; *Bowers, supra*, 145 Cal.App.4th at p. 878; *People v. Galindo* (2006) 142 Cal.App.4th 531, 533.) The element of serious difficulty in controlling dangerous behavior limits " 'involuntary civil

6

confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.' " (*In re Howard N., supra,* 35 Cal.4th at p. 128.)

Defendant complains that Dr. Kepner did not define schizophrenia or paranoia or offer facts and reasoning but instead "offered mere labels, largely based not on his own diagnosis and examination" but on defendant's history as reflected in medical records. We disagree with defendant's representation of Dr. Kepner's testimony and conclude that the evidence supports Dr. Kepner's opinion that defendant posed a substantial danger due to his mental disorder and had serious difficulty in controlling his dangerous behavior and would continue to do so if released from the hospital.

Dr. Kepner had been a member of defendant's treatment team and had been personally involved in defendant's treatment since 2009. Dr. Kepner relied upon his personal observations from treating defendant and information provided to him by other treating mental health professionals at Napa, besides defendant's medical records. Dr. Kepner described defendant's mental disease as schizophrenia, a life-long chronic condition. Although such diagnosis was in defendant's records and made by a different physician, Dr. Kepner concurred with it. Defendant's mental disorder is demonstrated by paranoia as well as auditory hallucinations for which he was receiving medication by injection every other week because oral medication was ineffective in controlling his symptoms. Defendant's medication helped him control his condition but it did not eliminate all of his paranoid symptoms in that defendant still exhibited "suspicious thinking." Dr. Kepner explained that defendant's mental disorder had been under relative control during his commitment but "[i]t's not in control all the time, and -- and we do have the concern if he is not under treatment and supervision that it may not be under control, and he could be a substantial danger to others." The evidence shows that at the time of his commitment offense, defendant had voluntarily stopped taking his medication, abused alcohol, and could not control his behavior when he was off his medication. Dr. Kepner testified that using alcohol reduced the effectiveness of

7

defendant's medication which could trigger a relapse in his treatment. Dr. Kepner had concerns, based on his history, that without supervision, defendant would stop taking his medication once again and abuse alcohol. Dr. Kepner testified that defendant admitted a long history of alcohol use.

Defendant admitted that he still experienced episodes of paranoia and hallucination and that when he stopped taking medication in the past, he became paranoid and had delusions. He also testified that his symptoms did not cause him to be violent all the time but when he was agitated, he would become violent.

Defendant had been medication compliant but he had been in a controlled environment, the hospital. Although defendant had some insight into his mental disorder, it was limited. Defendant minimized and denied the severity of his mental disorder and that alcohol exacerbated his symptoms. Defendant did not fully recognize the warning signs in order to identify them and seek help. Dr. Kepner and the treatment team did not believe that defendant understood his potential for danger and the precursors of his dangerous behavior.

Defendant argues there was little, if any, evidence he ever tried to control his behavior or that he encountered serious difficulty in doing so. The trial court here considered the control issue, specifically noting the prosecution was required to prove the element. Citing Dr. Kepner's testimony, the trial court specifically found defendant "does have serious difficulty in controlling his dangerous behavior." Dr. Kepner and Dr. Bleman prepared a formal evaluation of defendant's condition which was reviewed by the medical director at Napa and, as demonstrated by his testimony, Dr. Kepner was well versed on defendant and his condition and history, opining defendant had significant problems controlling his behavior when not taking his medication, which defendant admitted.

We conclude the record contains sufficient evidence to support the court's findings that defendant, by reason of his mental disorder, represents a substantial danger and has serious difficulty controlling his dangerous behavior.

## II

### *Denial of Release on CONREP*

The court granted the petition to extend defendant's commitment and denied defendant's request for placement in an outpatient treatment program. The court impliedly found defendant represented a substantial danger if released under the supervision of CONREP. Defendant contends insufficient evidence supports this finding. We disagree.

The court's order denying outpatient status is reviewed for abuse of discretion, that is, the court exceeded the bounds of reason, considering all the circumstances. (*People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2; *People v. Henderson* (1986) 187 Cal.App.3d 1263, 1268, 1270.)

"A person may be released from a state hospital (1) upon restoration of sanity pursuant to the provisions of section 1026.2, (2) upon expiration of the maximum term of commitment under section 1026.5 [citation], or (3) upon approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1.) [¶] . . . [¶] 'Outpatient status is not a privilege given the [offender] to finish out his sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community.' [Citation.]" (*People v. Sword, supra*, 29 Cal.App.4th at p. 620.)[2]

---

[2]     At the time the petition for extended commitment was granted, section 1602 provided:

9

"(a) Any person subject to the provisions of subdivision (b) of Section 1601 may be placed on outpatient status, if all of the following conditions are satisfied:

"(1) *In the case of a person who is an inpatient, the director of the state hospital or other treatment facility to which the person has been committed advises the court that the defendant will not be a danger to the health and safety of others while on outpatient status, and will benefit from such outpatient status.*

"(2) *In all cases, the community program director or a designee advises the court that the defendant will not be a danger to the health and safety of others while on outpatient status, will benefit from such status, and identifies an appropriate program of supervision and treatment.*

"(3) After actual notice to the prosecutor and defense counsel, and after a hearing in court, the court specifically approves the recommendation and plan for outpatient status.

"(b) The community program director or a designee shall prepare and submit the evaluation and the treatment plan specified in paragraph (2) of subdivision (a) to the court within 15 calendar days after notification by the court to do so, except that in the case of a person who is an inpatient, the evaluation and treatment plan shall be submitted within 30 calendar days after notification by the court to do so.

"(c) Any evaluations and recommendations pursuant to paragraphs (1) and (2) of subdivision (a) shall include review and consideration of complete, available information regarding the circumstances of the criminal offense and the person's prior criminal history." (Italics added.) (Stats. 1985, ch. 1232, § 10, pp. 4225-4226.)

At the time the petition for extended commitment was granted, section 1603 provided:

"(a) Any person subject to subdivision (a) of Section 1601 may be placed on outpatient status if all of the following conditions are satisfied:

"(1) The director of the state hospital or other treatment facility to which the person has been committed advises the committing court and the prosecutor that the defendant would no longer be a danger to the health and safety of others, including himself or herself, while under supervision and treatment in the community, and will benefit from that status.

10

Dr. Kepner testified defendant had not yet been recommended for placement in CONREP. Dr. Kepner's testimony meant Napa mental health professionals had not recommended defendant to CONREP, contrary to defendant's interpretation that Dr. Kepner stated CONREP had to first evaluate defendant.[3] Dr. Kepner also explained that if defendant were released in the community, "his risk for dangerousness would greatly increase, and he would be a danger to others." Defendant required the injectable form of his antipsychotic medication and Dr. Kepner was concerned about defendant's ability to take it in an unsupervised setting given his history, that is, stabbing his wife (the

"(2) The community program director advises the court that the defendant will benefit from that status, and identifies an appropriate program of supervision and treatment.

"(3) The prosecutor shall provide notice of the hearing date and pending release to the victim or next of kin of the victim of the offense for which the person was committed where a request for the notice has been filed with the court, and after a hearing in court, the court specifically approves the recommendation and plan for outpatient status pursuant to Section 1604. The burden shall be on the victim or next of kin to the victim to keep the court apprised of the party's current mailing address.

"In any case in which the victim or next of kin to the victim has filed a request for notice with the director of the state hospital or other treatment facility, he or she shall be notified by the director at the inception of any program in which the committed person would be allowed any type of day release unattended by the staff of the facility.

"(b) The community program director shall prepare and submit the evaluation and the treatment plan specified in paragraph (2) of subdivision (a) to the court within 30 calendar days after notification by the court to do so.

"(c) Any evaluations and recommendations pursuant to paragraphs (1) and (2) of subdivision (a) shall include review and consideration of complete, available information regarding the circumstances of the criminal offense and the person's prior criminal history." (Stats. 2004, ch. 628, § 1, p. 4906.)

[3] Dr. Kepner did testify (in a confusing manner) that defendant had to be committed under section 1026 to enter CONREP. Dr. Kepner also testified, "We're always working with people towards CONREP," and that occasionally a patient has been released directly without going through CONREP.

commitment offense) two weeks after he stopped taking his medication. The evaluation noted, "If in the community, [defendant's] risk for dangerousness would greatly increase, and he would be a danger to others." The evaluation also noted defendant did not have the ability "to sustain his ongoing need for treatment if released in the community."

In denying release on CONREP, the court stated it was "not prepared to make that order today. He does have a treatment team that is working with him. It sounds like in evaluating him, I am not prepared to make the order that I make the decision that he go to an outpatient treatment program. [¶] Again, from the testimony that I heard, it looks like he is certainly working towards that goal, but I believe that at this point in time that he is in the appropriate place, and I am going to return him to Napa to continue that treatment."

The court had already found defendant posed a substantial danger of physical harm to others and had serious difficulty in controlling his dangerous behavior. Dr. Kepner testified the treatment team had not yet recommended release to CONREP and defendant's risk to others would greatly increase if released. There was no evidence defendant would no longer pose a danger to the health and safety of others while on outpatient status (§ 1602, subd. (a)(1) & (2)); indeed, quite the opposite was shown. The court did not abuse its discretion in denying defendant's request for CONREP.

## DISPOSITION

The order extending commitment is affirmed.


     NICHOLSON     , Acting P. J.


We concur:


     MAURO     , J.


     DUARTE     , J.