Filed 8/17/16  P. v. Zimmerman CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>KEVIN NEAL ZIMMERMAN,<br><br>     Defendant and Appellant. | F071013<br><br>(Super. Ct. No. VCF025487-87)<br><br>**OPINION** |

**THE COURT**[*]

APPEAL from an order of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.  (Retired judge of the Tulare County Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Kane, Acting P.J., Peña, J. and Smith, J.

Appellant Kevin Neal Zimmerman appeals from the trial court's order granting a petition extending his commitment pursuant to Penal Code section 1026.5.[1] On appeal, he contends the evidence is insufficient to support the granting of the petition. We affirm.

## FACTS

*Background*

On August 10, 1987, Zimmerman, who was then 19 years old, waited in a stolen truck in the parking lot of a hospital until he saw a female staff member drive off and he began following her. Zimmerman passed the woman and stopped his truck in a narrow part of the road, forcing the woman to stop her car. Zimmerman exited the truck with a gun in his hand, pointed it at the woman, and ordered her out of her car. He then grabbed her by the arm and attempted to get her into his truck. After the woman broke free, Zimmerman fired a shot in the air and threatened to shoot her. Zimmerman again grabbed her by the arm and attempted to force her into his truck. As they struggled, Zimmerman hit the woman in the head with the gun. When another vehicle approached, Zimmerman got in his truck and left, alone.

On January 29, 1988, the district attorney filed a first amended information charging Zimmerman with attempted kidnapping (count I/§§ 664/207, subd. (a)) and assault with a firearm (count II/§ 245, subd. (a)(2)). Each count also alleged a personal use of a firearm enhancement (§ 12022.5). Zimmerman then pled not guilty and not guilty by reason of insanity (NGI) to both charges.

Dr. Frank Kleist and Dr. Dwight Sievert were appointed by the court to examine Zimmerman. During the evaluation by Dr. Kleist, Zimmerman stated that he had been experiencing mounting tension in the weeks and months prior to committing the

---

[1]     All further statutory references are to the Penal Code.

2

underlying offenses. During the two weeks prior to assaulting the victim, he smoked a high grade of marijuana daily. A week before he assaulted the victim he took a "hit of acid," and in the 24 to 48 hours prior to committing his offenses he freebased a quarter gram of cocaine.

In the two years prior to the underlying incident, Zimmerman had a delusional belief that he was changing from a man to a woman. He felt his chest getting flabby, that he was growing breasts, and that his voice was becoming more feminine. He also began having homosexual thoughts about men and boys and thoughts that he was having intercourse with himself in his dreams. Zimmerman felt women made him feel that way. He blamed the victim and other women for making his body change and it made him angry at them. Zimmerman assaulted the victim because he wanted to degrade her and make her not feel like a woman, the same way that he did not feel like a man. On the day Zimmerman assaulted the victim, he was coming down from freebasing cocaine. Just prior to committing the assault, he ingested about three tablets of Xanax that he stole from his father's medicine cabinet. Dr. Kleist noted that Zimmerman experienced auditory hallucinations including hearing crushing sounds and deep voices that whispered to him.

In his evaluation, Dr. Sievert noted that Zimmerman would experience somatic hallucinations, e.g., that his hands and feet were splitting open or that his voice was becoming more feminine. Both doctors, in pertinent part, diagnosed Zimmerman as suffering from chronic schizophrenia, paranoid type, and recurrent major depression with psychotic features, and both concluded that he was legally insane when he assaulted the victim on August 10, 1987.[2]

On February 19, 1998, after Zimmerman pled guilty to attempted kidnapping and admitted the arming enhancement attached to that count, the court found him not guilty

---

[2] Zimmerman was noncompliant with his medication when he assaulted the victim.

by reason of insanity. On March 24, 1988, pursuant to section 1026, Zimmerman was committed to Atascadero State Hospital for a maximum term of 6 years. His commitment was extended several times pursuant to section 1026.5. On September 4, 2014, the district attorney filed another petition to extend Zimmerman's commitment.

*The Hearing on the Petition*

On February 4, 2015, at a bench trial on the petition, Dr. Hasnain Maqsood testified that he had been Zimmerman's treating psychiatrist for three months at Napa State Hospital (NSH), where Zimmerman was then committed, and that he examined Zimmerman in preparation for the hearing. Dr. Maqsood also reviewed Zimmerman's legal chart, his social worker's notes, and his progress notes. He consulted with Zimmerman's treatment team, which consisted of a psychologist, a social worker, the nursing staff and the psychiatric technicians on Zimmerman's unit.

Dr. Maqsood diagnosed Zimmerman with schizophrenia with multiple episodes that was in partial remission. The criteria for a diagnosis of schizophrenia included delusions, hallucinations, disorganized thoughts, and negative symptoms, which include lack of emotional expression, lack of interest, evolution, and minimization of psychiatric symptoms. According to Dr. Maqsood, although schizophrenia is a progressive disease, Zimmerman's symptoms were currently under control because he was in treatment and he was only experiencing the negative symptoms noted above. Previously, however, Zimmerman had met additional criteria for schizophrenia. For example, at the time of his commitment offense, he was delusional, heard voices, and thought that someone was threatening and chasing him. Additionally, in 2004, Zimmerman was discharged from the Conditional Release Program (CONREP) because he became delusional and barricaded himself in his room, believing someone was plotting against him and trying to rape him. On September 15, 2014, Zimmerman was heard talking to himself and stating, "She kill you. The bitch from hell." The next day he was found pacing and talking to himself loudly in his room.

4

Zimmerman also had experienced three episodes of water intoxification, i.e., the excessive ingestion of water. The most recent episode occurred in August 2014 when he gained 10 to 11 pounds in one day from drinking water.

Zimmerman also had a history of traumatic brain injury. When he was 17 years old, his father pushed him against a wall, causing him to hit his head and leaving him in a coma for 10 days. An MRI done 10 years later disclosed that the frontal lobes of his brain had atrophied and shrunk. According to Dr. Maqsood, frontal lobe damage can cause poor impulse control and patients with this type of injury can become aggressive and violent. Although he had not exhibited poor impulse control in the preceding year, Zimmerman had a history of being aggressive and physically assaultive.

Zimmerman had been discharged under CONREP and returned to the hospital on two prior occasions. In addition to his 2004 termination from the program, in 1997, his CONREP was revoked and he was readmitted to NSH as a TANGI[3] patient because he was using his money to buy pornographic material and hire exotic dancers. On both occasions the CONREP director found that he posed an imminent threat of harm.

Zimmerman was currently taking four medications nightly and another medication by intramuscular injection every two weeks. He was not currently exhibiting any symptoms of schizophrenia aside from the previously mentioned negative symptoms because these medications were controlling his symptoms.

Dr. Maqsood opined that despite his compliance with his medication, Zimmerman's schizophrenia caused him to pose a substantial danger of physical harm to others if released because his delusions could cause him to become violent again. Dr. Maqsood based his opinion on a myriad of circumstances including: (1) Zimmerman's

---

**3** TANGI refers to a temporary admission of a patient who had been found not guilty by reason of insanity.

5

criminality, history of substance abuse,[4] which was "the biggest risk predictor for future violence," and his history of chronic mental illness and past violence, which were also risk factors for future violence; (2) his history of noncompliance with his medication; (3) his failure to have a relapse prevention plan and to participate in substance abuse groups and other groups he was assigned to; (4) his failure to meet the criteria for CONREP release;[5] (5) his inability to understand his need for medication; (6) his inability to identify "triggers" that caused him to decompensate or to ingest drugs; (7) his inability to express remorse or empathy for the victim; (8) his poor insight into his illness and lack of understanding of his commitment offense; and (9) a risk assessment performed by another psychologist who concluded that Zimmerman posed a moderate risk of violence in the community.

Dr. Maqsood also opined that without medication Zimmerman would have serious difficulty controlling his dangerous behavior.[6] Dr. Maqsood acknowledged that Zimmerman was compliant with his treatment plan while confined at the hospital, and that his medications had controlled the more serious symptoms of his schizophrenia, including his delusions. Nevertheless, based on Zimmerman's history of noncompliance, Zimmerman's limited insight into his mental health issues, and his own assessments, Dr. Maqsood opined that Zimmerman would not continue to take his medication if he was not supervised.

---

[4] Zimmerman's substance abuse began when he was 14 years old and included abuse of alcohol, cocaine, marijuana and opioids. At a young age he was in a rehabilitation program for a year. In 2005 he tested positive for opioids.

[5] The criteria for CONREP release included: being free of drugs for six months, participation in all groups assigned to him, the ability to perform "his functions" socially on the open unit, and full compliance with his treatment plan.

[6] Dr. Maqsood did not identify the specific circumstances on which he based this opinion. Nevertheless, it is clear from the record that he based it on many of the circumstances he cited in support of his opinion that Zimmerman posed a danger to others because of his schizophrenia.

In granting the petition for recommitment, the court, in pertinent part, found that Zimmerman had a mental disease, i.e., schizophrenia, and that as a result of his schizophrenia he posed a danger of physical harm to others and had serious difficulty controlling his dangerous behavior.

## **DISCUSSION**

Zimmerman contends the evidence is insufficient to sustain the court's order granting the petition for recommitment because the record does not contain substantial evidence that supports a finding that Zimmerman had serious difficulty in controlling his dangerous behavior. We disagree.

> "Under section 1026.5, subdivision (b)(1), '[a] person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.' The maximum term of commitment prescribed in subdivision (a) is 'the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted ….' (§ 1026.5, subd. (a)(1).)

> "At no less than 90 days before the term of commitment ends, the prosecuting attorney may file a petition for extended commitment in the superior court which issued the original commitment. (§ 1026.5, subd. (b)(2).) The person named in the petition has a right to be represented by an attorney and the right to a jury trial. (§ 1026.5, subd. (b)(3).) If, after trial, the court or jury finds the patient 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others,' the patient will be recommitted for an additional period of two years from the date of termination of the previous commitment. (§ 1026.5, subd. (b)(8).)" (*People v. Bowers* (2006) 145 Cal.App.4th 870, 876 (*Bowers*).)

In *Howard N.* (2005) 35 Cal.4th 117 (*Howard N.*), after recognizing that a civil commitment constitutes a significant deprivation of liberty that requires due process protection, our Supreme Court held that the extended detention scheme of such a commitment required " 'that the state demonstrate that the "*mental … deficiency,*

7

*disorder, or abnormality" causes the person to have serious difficulty controlling his dangerous behavior.' "* (*Bowers*, *supra*, 145 Cal.App.4th at pp. 876-877, italics added.)

> " ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.] "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*Bowers*, *supra*, 145 Cal.App.4th at pp. 878-879.)

Here, Dr. Maqsood testified that Zimmerman posed a danger if released because he suffered from chronic schizophrenia with delusions and he suffered a brain injury at age 17 that could cause him to have poor impulse control and to become aggressive and violent. His opinion was based on the delusional nature of Zimmerman's symptoms and several other factors, including Zimmerman's belief that he was not mentally ill and did not need medication, his substance abuse, which was the biggest risk predictor for future violence, and his failure to participate in any substance abuse programs at the hospital. Zimmerman's inability to identify "triggers" that could cause him to decompensate or to ingest drugs, his lack of insight into his illness, lack of understanding of his commitment offense, and his inability to express remorse or empathy for the victim provided further support for Dr. Maqsood's opinion that Zimmerman would pose a danger to others if released. Thus, the record contains substantial evidence that supports the court's finding that Zimmerman posed a serious danger to others if released.

"The People are not required to prove the defendant ' "is completely unable to control his behavior." ' [Citations.] Instead, the defendant's 'impairment need only be serious, not absolute.' [Citation.] As the [Supreme Court in *Kansas v. Crane* (2002)

8

534 U.S. 407, 411, 151 L.Ed.2d 856 (*Crane*)] explained, 'there may be "considerable overlap between a … defective understanding or appreciation and … [an] ability to control … behavior." ' " (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370.)  It is undisputed that Zimmerman suffered from a severe mental disorder that without medication caused him to be delusional, impulsive, paranoid and violent.  It was also undisputed that Zimmerman had limited insight into his behaviors that caused him to be violent or his need for medication.  Thus, the record also contains substantial evidence that supports the court's finding that Zimmerman would have serious difficulty controlling his dangerous behavior if released.  (Cf. *ibid*.)

Zimmerman misplaces his reliance on *People v. Galindo* (2006) 142 Cal.App.4th 531 (*Galindo*) and *In re Anthony C.* (2006) 138 Cal.App.4th 1493 (*Anthony C.*) in support of his insufficiency of evidence claim.  In *Galindo*, the trial court held a bench trial and extended an NGI commitment of a defendant who was diagnosed with bipolar disorder.  Because the trial occurred prior to the Supreme Court issuing its *Howard N.* decision (*Galindo*, *supra*, 142 Cal.App.4th at p. 539), the trial court did not make an *express or implied* finding that the defendant's mental disorder caused him to have serious difficulty in controlling his dangerous behavior.  In order to sustain the judgment, the appellate court was required to find that the failure to make this finding was harmless beyond a reasonable doubt.  In finding the error prejudicial, the court noted there was "abundant evidence that defendant's behavior was dangerous and that he did not, in fact, control it.…  [T]he fact he *did not* control his behavior does not prove that he *was unable to do so,* thus making him 'dangerous beyond [his] control.' " (*Ibid*.)  Remand was therefore necessary to allow the issue of control to be determined. (*Ibid*.)

*Galindo* is inapposite because in that case the trial court failed to make an express or implied finding that the defendant's mental disease, condition, or disorder caused him serious difficulty in controlling his dangerous behavior.  Thus, to sustain the judgment the appellate court had to find that the failure to make a finding on this issue was

9

harmless beyond a reasonable doubt.  Here, because the court addressed this issue, the standard of review is whether substantial evidence supported the trial court's recommitment order.  Further, unlike *Galindo*, here the record contains evidence, including Dr. Maqsood's expert testimony, that supported the trial court's finding that Zimmerman's mental disorder caused him serious difficulty in controlling his dangerous behavior.

*Anthony C.*, is inapposite because, as noted by Zimmerman, in that case the expert's opinion "fail[ed] to satisfy the quantitative requirement that [the defendant had] 'serious difficulty' in controlling his behavior." (*Anthony C.*, *supra*, 138 Cal.App.4th at p. 1507.)  Here, Dr. Maqsood testified that Zimmerman's mental disorder caused him to have serious difficulty in controlling his behavior, his opinion is supported by the record, and as noted *ante*, one expert's opinion is sufficient to support the court's finding as to this issue.  (Cf. *Bowers*, *supra*, 145 Cal.App.4th at pp. 878-879.)  Accordingly, we reject Zimmerman's sufficiency of the evidence challenge to the court's order extending his commitment.

## DISPOSITION

The order extending Zimmerman's commitment pursuant to section 1026.5 is affirmed.

10