Filed 2/14/14  P. v. Crooks CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>WILLIAM GRANT CROOKS,<br><br>  Defendant and Appellant. | D062827<br><br><br><br>(Super. Ct. No. CR56642) |

APPEAL from an order of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

William Grant Crooks appeals from an order recommitting him to Patton State Hospital (Patton) under Penal Code[1] section 1026.5, subdivision (b), as a person found not guilty by reason of insanity (NGI). He contends there was insufficient evidence to establish his mental illness resulted in serious volitional impairment or would cause him to be a current danger to others if released. We disagree and affirm the order.

## BACKGROUND

In January 1982 Crooks was found NGI of vehicular manslaughter (former § 192 (3)(a), now § 192 (c)(1)), hit and run (Veh. Code, § 20001, subd. (a)), and assault with a deadly weapon (§ 245, subd. (a)), the latter of which included an allegation he personally used a firearm (§ 12022.5, subd. (a)). According to a mental health report, at the time of the offenses "Crooks was suffering from a delusion that his roommates were going to torture him and send him to a mental hospital where he would be starved. He believed the CIA or Secret Service was also involved. [He] cut his wrists in an attempt to commit suicide. He then fled from his roommates, went into a residence and took a screwdriver, then entered a second home where he disarmed the resident who had a handgun. In addition to cutting his wrists, he attempted to shoot himself, but the gun malfunctioned. He then commandeered an automobile and drove through a red light in [an] attempt to kill himself. This caused an accident, which killed another person."

---

1     Further statutory references are also to the Penal Code unless otherwise stated.

The superior court committed him to the State Department of Mental Health (now State Department of State Hospitals) and he was admitted to Patton. Twice after his commitment, Crooks was unsuccessfully placed in a conditional release program intended to help him transition from being in a supervised hospital setting to living in the community. He was returned to Patton after the first placement for medication noncompliance, substance abuse, and psychotic decompensation. He absconded from the second placement and remained at large for about five years.[2] While he was at large, he made threatening phones calls to the program, which eventually led to his capture and return to Patton.

Crooks's commitment to Patton had been extended multiple times and was set to expire in August 2012. In April, the People petitioned to extend his commitment for another two years.

*People's Evidence*

*Dr. Glassman's Testimony*

At a jury trial on the petition, court-appointed psychiatrist Dr. Jaga Nath Glassman testified Crooks had paranoid schizophrenia. According to Dr. Glassman, schizophrenia is the most common and most severe psychotic disorder. It is characterized by symptoms, such as delusions, hallucinations, and disorganized thinking, indicating a lack of touch with reality and an inability to think rationally. People with schizophrenia are

---

[2]    Crooks testified he absconded from the program because the program was going to return him to Patton for possessing vitamins, caffeinated ice tea, a radio, and a pornographic newspaper. He also testified that absconding from the program to avoid returning to Patton was a good decision.

3

often withdrawn, isolated, and unmotivated and have a difficult time working, socializing, maintaining relationships, keeping appointments, or otherwise functioning in the real world.

Dr. Glassman believed Crooks's mental illness was not in remission and required continued treatment because Crooks was still delusional about the events leading to his initial commitment.[3] In addition, Crooks's thought processes were disorganized and the associations between his thoughts were sometimes illogical.

Dr. Glassman further believed Crooks represented a substantial risk of physical harm to others for several reasons, including that Crooks did not think he was still mentally ill. Crooks told Dr. Glassman the only time he was ever mentally ill was for a three-week period around the time of the events leading to his initial commitment. He claimed he never exhibited any further symptoms of mental illness and his mental illness had been in remission since then.

Additionally, Crooks had "quite poor, quite limited" insight into his need for medication. He only took medication because it was prescribed. Dr. Glassman believed Crooks's limited insight created a very high risk he would stop taking his medication if released, and stopping medication is the most common cause of major psychotic decompensation.

Moreover, Crooks had not developed or been able to articulate a coherent relapse prevention plan. Crooks planned to rely on others to tell him when he was acting

---

[3] Crooks's testimony about the events tended to support Dr. Glassman's conclusion.

4

strangely, which is an abdication of personal responsibility and not an ideal means of managing a mental illness. Although Crooks wanted to connect with a facility in Long Beach, California called "The Village" to obtain medication and other assistance, his plans for making the connection were not concrete.

Crooks also had a history of substance abuse, including the use of marijuana, alcohol, and LSD during the time he was at large. Each of these substances can worsen the symptoms of schizophrenia. Crooks denied ever having a substance abuse problem and refused to participate in substance abuse treatment. Consequently, he had a greater likelihood of resuming substance abuse if released, which increased his risk for dangerous behavior and psychosis.

Of further concern to Dr. Glassman was Crooks's history of threatening behavior requiring emergency treatment with rapid onset medication. Nonetheless, Dr. Glassman acknowledged the last such incident occurred more than a year before trial and there was no indication in Crooks's records he had physically harmed anyone since the events leading to his initial commitment.

*Dr. Martin's Testimony*

Like Dr. Glassman, Dr. Peter Martin, a staff psychiatrist at Patton, testified Crooks had paranoid schizophrenia. He also had a history of alcohol abuse severe enough to meet the criteria for an alcohol dependence diagnosis.

The symptoms of Crooks's schizophrenia include hallucinations, delusions, and disorganized thoughts. To reduce these symptoms, Crooks received a shot of psychotropic medication monthly and an oral supplementary medicine nightly. He had

5

not received any treatment for his alcohol dependence because he did not believe he had a substance abuse problem and had refused to participate in a substance abuse treatment program.

Also like Dr. Glassman, Dr. Martin believed Crooks's mental illness caused him to have serious difficulty controlling his dangerous behavior and posed a substantial danger of physical harm to others. While recognizing Crooks showed an "amazing" improvement in the year and a half preceding the trial, Dr. Martin noted Crooks continued to present with the same psychotic symptoms, including delusions, depression, and problems with impulse control, he experienced immediately before and after the events leading to his initial commitment.

In addition, Crooks believed his illness was in remission and he could manage it without medication through meditation, chanting and Eastern practices. Consequently, Dr. Martin "seriously doubt[ed]" Crooks would continue taking medication if released.

Moreover, Crooks did not know the precursors of his dangerousness and had only a superficial relapse prevention plan. If he had a problem, he planned to take medication and "sleep on it" or go to an emergency room. He also planned to rely on his wife and friends for assistance, even though he does not have a wife or any other social support in the community.

While Crooks recently had become calmer, more compliant to rules and less militant against taking medication, Dr. Martin remained concerned he would fail if released into the community because of his lack of insight into his mental illness, his continued strong resistance to taking medication, his lack of social support, and the

likelihood he would resume substance abuse. Dr. Martin opined that if Crooks stopped taking his medication he would decompensate to the same state he was in at the time of the events underlying his initial commitment, or even worse. Dr. Martin acknowledged, however, Crooks was suicidal at the time of the events underlying his initial commitment and he has not shown suicidal ideation since then.

*Crooks's Evidence*

### *Dr. Heller's Testimony*

Court-appointed psychologist Beatrice Heller evaluated Crooks and, like Drs. Glassman and Martin, concluded Crooks had paranoid schizophrenia. Unlike Drs. Glassman and Martin, however, Dr. Heller believed Crooks's schizophrenia was in remission because he did not display signs of hallucinations or delusions during the evaluation.

Although Crooks acknowledged to Dr. Heller that he had schizophrenia, Dr. Heller did not believe Crooks understood the severity of his mental illness. Crooks also said his medication made him feel better and he planned to continue taking it, but Dr. Heller had serious questions about whether he would, in fact, do so. In her view, there was a "pretty high risk" he would stop using medication if released into the community without supervision.

Dr. Heller did not believe Crooks currently presented a substantial danger of physical harm to others "[b]ecause he has sufficient ability for self-control and he didn't appear to be a particularly angry man and it seems that the aggressive acts in the past were—occurred while he was actively—he was—he was having an active delusion." In

7

addition, he did not have a record of causing injury to anyone since the events leading to his initial commitment.

Nonetheless, Dr. Heller conceded on cross-examination that, if released into the community without supervision, there was a risk Crooks would pose a danger to others. She also conceded Crooks would pose a danger to others if his schizophrenia were uncontrolled, and his schizophrenia would most likely become uncontrolled if he stopped taking his medications or started abusing alcohol and street drugs.

*Patton Staff Members' Testimony*

*Nurse Gregory*

Allen Gregory, a registered nurse at Patton, had known Crooks for five or six years. He never witnessed any violent behavior by Crooks and had not witnessed any aggressive behavior in the preceding four or five years. In the preceding year, Crooks had model behavior.

Gregory could not recall an instance where Crooks refused psychotropic medication. He could recall a couple of instances where Crooks refused to take thyroid medicine, but not in the preceding year. Gregory believed Crooks's willingness to take medication would depend on the prescription; however, he believed Crooks would continue to take the medication he had most recently been prescribed.

Crooks told Gregory he planned to go to The Village facility in Long Beach if released. Crooks was not specific about this plan, however.

8

*Psychiatric Technician Castillo*

Sheri Castillo, a psychiatric technician at Patton, had known Crooks for about five years. She never saw him act violently. At times, Crooks did not like to take medication. When he was off his medication, he would be hyper-verbal and a little agitated, but not violent.

Crooks told Castillo he no longer liked alcohol. She believed he genuinely desired to avoid substance abuse in the future. Castillo also believed Crooks would take his medication if he was in some sort of structured environment, but she doubted he would take his medication if he was in an unstructured environment. She further believed he would possibly pose a danger to others if he was in an uncontrolled environment and stopped taking his medication.

*Psychiatric Technician Veulvas*

Jennifer Veulvas, a psychiatric technician at Patton, testified Crooks was a patient in her unit. She never observed violent behavior by him, although he had been disruptive. His behavior improved in the preceding year and a half after a medication change. According to her, Crooks realized he had to take medication for the rest of his life and he did not have to be sought out and reminded to take his medication.

Crooks told her he wanted to go to The Village if released. She had previously toured the facility. It was not a place to stay, but it provided placement assistance. Crooks asked her and other Patton staff members about the facility and she told him what she knew.

*Crooks' Testimony*

Crooks testified he had paranoid schizophrenia and admitted it took him a long time to accept he had a mental illness. A recent medication change helped him reach acceptance because the new medication calmed him and helped him think more clearly. He believed his mental illness was in remission and had been in remission for most of his commitment as well as during the time he was at large.

He denied ever refusing to take medication in the past, but testified there were periods of time when his doctors took him off medication. He also denied he had stopped taking medication while he was at large. He claimed he did not like how he felt when he was off medication and knew medication would keep his mental illness in remission. Along with medication, he used yoga, meditation, and other stress-reduction aids to keep his illness in remission.

Crooks testified he was suicidal at the time of the events leading to his initial commitment. He denied ever being suicidal before or since then.

Crooks admitted he abused alcohol in the past and occasionally drank beer while he was at large, but he denied having a current alcohol problem. He stopped drinking while in Patton and no longer liked the taste of beer or desired to drink. Crooks also admitted he used illegal drugs as a teenager, including LSD, mushrooms, peyote, and mescaline; however, he denied any illegal drug use since his commitment. If released, he planned to use meditation and substitutes, such as soda, coffee, and tea, to avoid substance abuse.

He denied engaging in any violent behavior since the events leading to his initial commitment. He also denied ever making any threatening phone calls to the conditional release program while he was at large. He claimed he contacted the program so he could get his case dismissed and move on with his life. He admitted, however, he was drinking at the time he made the phone calls and did not really know what he said.

Crooks testified he prepared a 50-page relapse prevention plan and gave it to Dr. Martin, but Dr. Martin was not interested in it and read only the first page. If released, he planned to return to his hometown of Long Beach and seek assistance from The Village. He would have a case manager from The Village help him find housing and get his social security and Medi-Cal reinstated. He would pay The Village back once he began receiving social security and his credit card was reactivated. He would also continue to seek treatment, including medication and some type of therapy. If The Village could not assist him, he would stay at the board and care facility where he stayed when he was at large. He also wanted to get a college degree, become an accountant, and move to New Zealand.

After considering the parties' evidence, the jury found Crooks suffered from a mental illness. The jury also found he represented a substantial danger of physical harm to others because of his mental illness.

DISCUSSION

Section 1026.5, subdivision (b)(1), permits the extension of a person's commitment as an NGI only if the person "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." Appellate courts

11

have interpreted this section "as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior." (*People v. Galindo* (2006) 142 Cal.App.4th 531, 533; accord, *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159, 1165; *People v. Bowers* (2006) 145 Cal.App.4th 870, 878.) Thus, in a proceeding to extend a person's commitment as NGI, the People must prove beyond a reasonable doubt (1) the person suffers from a mental illness because of which (2) the person poses a substantial danger of physical harm to others and (3) has serious difficulty controlling his or her dangerous behavior. (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1366; CALCRIM No. 3453.) Conversely, the person may defend against the extension by proving by a preponderance of evidence medication effectively controls his mental illness and he will take his medication without fail in a completely unsupervised environment. (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1602.)

" ' " ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.] "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt." ' " ' " (*People v. Kendrid, supra*, 205 Cal.App.4th at p. 1370.) "A single psychiatric opinion that an individual is dangerous because of a mental disorder

12

constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers*, *supra*, 145 Cal.App.4th at p. 879.)

In this case, two psychiatrists, a psychologist, and Crooks all agreed Crooks had paranoid schizophrenia. In addition, the two psychiatrists both agreed Crooks's mental illness was not in remission because he still exhibited symptoms of delusions and disorganized thinking. In fact, Crooks appeared to exhibit these symptoms during his testimony.

The two psychiatrists additionally agreed Crooks posed a substantial danger of physical harm to others because he had little to no insight into his mental illness and his corresponding need for medication. Because of his lack of insight and history of medication noncompliance, the two psychiatrists also agreed Crooks would most likely stop taking his medication if released, and once he stopped taking his medication he would decompensate. Dr. Glassman believed the decompensation could be major. Dr. Martin believed the decompensation could be as bad as or worse than it was at the time of the events leading to Crooks's initial commitment. Both psychiatrists further believed Crooks's history of alcohol abuse and failure to complete substance abuse treatment compounded his dangerousness.

Even the psychologist who testified for Crooks believed there was a "pretty high risk" Crooks would stop taking his medication if released. She also agreed his failure to take medication or his resumption of alcohol abuse would most likely cause his schizophrenia to become uncontrolled, at which point he would pose a danger to others.

13

Notwithstanding this evidence, Crooks contends there is no evidence he has serious difficulty controlling his dangerous behavior. In support of this point, he emphasizes he has not committed a violent act since the events leading to his commitment. However, "proof of a recent overt act is not constitutionally required to extend the commitment of a person found to be criminally insane." (*People v. Overly* (1985) 171 Cal.App.3d 203, 208.) Moreover, "[t]he People are not required to prove the defendant ' "is *completely* unable to control his behavior." ' [Citations.] Instead, the defendant's 'impairment need only be serious, not absolute.' [Citation.] As the [United States Supreme Court has] explained, 'there may be "considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior." ' " (*People v. Kendrid*, *supra*, 205 Cal.App.4th at p. 1370.)

Here, Dr. Martin testified Crooks continued to have the same problems with impulse control he had immediately before and after the events leading to his initial commitment. Dr. Glassman additionally testified people with schizophrenia have a lack of touch with reality and an inability to think rationally. They are also often withdrawn, isolated, and unmotivated and have difficulty working, socializing, maintaining relationships, keeping appointments, or otherwise functioning in the real world. Collectively, this evidence established Crooks had serious difficulty controlling his dangerous behavior. Accordingly, we conclude Crooks has not established there was insufficient evidence to support the extension of his commitment as an NGI.

14

DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.