Filed 2/17/23 P. v. Hadad CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN GEORGE HADAD,<br><br>    Defendant and Appellant. | F083054<br><br>(Fresno Super. Ct. No. CF96561316)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County. Jonathan B. Conklin, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant John George Hadad raises a substantial evidence challenge to the jury verdict that ultimately led to his recommitment to a state hospital. (See Pen. Code, § 1026.5, subd. (b).)[1] We reject the challenge and affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

## BACKGROUND

In an information filed April 25, 1996, the Fresno County District Attorney charged appellant with murder (§ 187) and a personal firearm use enhancement (§ 12022.5, subd. (a).) On June 19, 1998, the court found appellant was "legally insane" at the time of the offense. The court subsequently committed appellant to a state hospital.

On February 18, 2020, the People filed a petition to extend appellant's commitment pursuant to section 1026.5, subdivision (b). Appellant denied the allegations of the petition.

After a trial, the jury found the People had proven the allegation that, because of his mental disease, appellant poses a substantial danger of physical harm to others and has serious difficulty in controlling his dangerous behavior. The court ordered appellant's commitment extended through November 12, 2021. Appellant appeals.[2]

## FACTS

### *Underlying Offense*

On February 9, 1996, then-officer Victor Barrios responded to an address on Athens Avenue in Fresno. A neighbor ran out and said a man had possibly shot his wife. As officers approached the residence, appellant opened the front door and stood in the doorway holding a handgun. Barrios ordered appellant to drop the gun, but he did not immediately comply. Barrios told appellant to drop "the F-ing gun, while at the same time withdrawing [his] service pistol." Appellant dropped the gun.

Officer Barrios told appellant to get on the ground, face down. Appellant started to comply but then began to rise. Barrios believed appellant was trying to rearm himself, so officers took appellant to the ground.

---

[2] Because the recommitment period authorized by the challenged order is now over, there is an argument this appeal is moot. (See *People v. Redus* (2020) 54 Cal.App.5th 998, 1008–1009.) However, given that recommitments only last for two years and that the time to issue appellate opinions is often longer than that, we conclude this is an issue capable of repetition, yet evading review. Consequently, we will proceed to the merits.

As officers were placing appellant under arrest, he said, " 'I shot her. I give myself up to you.' "

Officer Barrios searched the home and found a nude woman dead in a shower with the water still running. The water pooled beneath her was red.

The victim had four gunshot entry wounds. The gunshot wounds were near the top of her head, behind the left ear, over the left cheek, and left hand. The cause of death was penetration of the brain due to multiple gunshot wounds to the head.

Benito Castellanos III, a police detective at the time, interviewed the four children appellant had with the victim. Castellanos did not locate any evidence indicating the victim had been abusing the children or poisoning appellant.

### *Dr. Dmitriy Sherman*

Dr. Dmitriy Sherman testified as the staff psychiatrist for Metropolitan State Hospital (the hospital) who had been treating appellant for about eight years. Appellant had been diagnosed with schizophrenia, a major mental disorder characterized by hallucinations and delusions. Hallucinations are perceptual experiences that are not real. Delusions are fixed, false beliefs not supported by reality.

Dr. Sherman agreed with the diagnosis of schizophrenia based on his own observations. Appellant was currently prescribed olanzapine, which also goes by the name Zyprexa. While olanzapine and Zyprexa are the same medication with the same chemical structure, appellant refuses to take medication labeled Zyprexa and will only take medication labeled olanzapine. Appellant has a delusional belief that Zyprexa is bad for his body, but olanzapine is "okay" for his body.

Appellant has made arbitrary decisions about other treatment as well. In 2016 or 2017, appellant was diagnosed with prostatic adenocarcinoma and glaucoma. The hospital recommended radiation and chemotherapy. Appellant said, "I don't have it. I don't need treatment. I'm fine." The hospital had to obtain a judicial determination

appellant lacked capacity to make informed decisions to accept or deny medical treatment.

When appellant would be transported to the University of Southern California for a medical procedure, he would refuse treatment and had to be returned to the hospital. This occurred on multiple occasions.

Appellant would place eye drops for his glaucoma on his cheeks instead of in his eyes as instructed.

Two years ago, appellant communicated his delusional beliefs that he is the son of God and can communicate telepathically with his friend in Syria. Appellant has not repeated those delusions "over the last couple years."

Over the years of his hospitalization, appellant never exhibited dangerous behaviors towards others, including no fights or suicide attempts. However, he recently had become less interactive with patients and staff. Dr. Sherman testified that four or five years ago, he and appellant would have meaningful discussions about his condition and symptoms. However, over the last two or three years, appellant had been "crossed up." When Dr. Sherman tries to discuss anything with appellant, he claims he does not speak English well and that he cannot hear well. When confronted with the necessity of treatment, appellant would get visibly agitated and leave the room.

Appellant is not willing to listen to any suggestions. Appellant has this trait even while on medication.

In the beginning years of Dr. Sherman's treatment of appellant, he claimed that his wife had been abusing and molesting their children and had been poisoning him. He said she "deserved what she got." However, two or three years ago he stopped saying that.

Appellant now admits he was "at fault." He also says, "there was a big problem with the wife." However, he does not get emotional or express remorse. Prompts to elicit further discussion fail.

4.

Appellant does acknowledge he has schizophrenia and that he killed his wife because of his mental illness. However, any attempts at further discussion are met with claims he does not understand English and cannot hear. He gets visibly agitated and leaves the interview room.

There is a program at the hospital called the "Wellness Recovery Action Plan" where patients put in writing a concrete plan, including what their warning signs of decompensation are, and what they would do if they developed symptoms. Over the many years of his hospitalization, appellant has not developed his Wellness Recovery Action Plan. He is not able to "identify precursors" of decompensation and cannot connect his symptoms to his actions. He has been without progress for many years.

Recently, appellant did say that if he felt bad, he would talk to a doctor. Appellant will not get more specific than that. Appellant had no plan as to how he would find a doctor or get to the doctor. Appellant claimed he will take his medicine. However, Dr. Sherman "know[s] what would happen" if he was given Zyprexa – he would not take it.

Appellant attends "groups" but does not talk. Staff does not know whether he is able to acknowledge the information learned from the groups.

Dr. Sherman expressed concern that appellant's delusions would prevent him from complying with treatment. For example, if a pharmacist filled his prescription with Zyprexa rather than olanzapine, he would not take it and the pharmacist would not know what the issue was. Dr. Sherman opined:

> "[T]here are multiple little things which can go wrong because [appellant] does not have this connection and this breach between developing or worsening of his delusions and his actions. He develops delusion[s] and then he acts. And in spite of years of hospitalization and treatment and attempts of mental health professionals to help him to develop this breach, it has been unsuccessful."

Dr. Sherman opined that appellant is able to control "conventional dangerous behaviors" while at the hospital considering he has not been in fights, nor has he been

5.

aggressive. However, Dr. Sherman believed that if appellant was released and stopped his medication, he would have difficulty controlling dangerous behavior. While in the hospital, appellant was at low risk for physical danger, suicide, or elopement. However, if released, the danger "would be elevated to high."

When a person stops taking olanzapine, their symptoms will increase. Dr. Sherman opined that if he was released from supervision there would be a "high danger" he would not take his medication, might develop delusions again, and might act on them in a dangerous way. For example, appellant might start thinking that his children are in danger again, accuse their spouses of molestation and confront them. If appellant stopped psychotropic medications, there is a "high probability" appellant would develop new delusions.

Dr. Sherman said appellant has no "comprehensive structure," contrasting him with other patients who have extensive knowledge of their symptoms, develop deep insight into their behaviors, acknowledge warning signs, and have a plan for if symptoms redevelop. Appellant lacked understanding of his symptoms and what they can lead to. "He never showed remorse about his actions. Very limited remorse."

Dr. Sherman did not conduct a validated violence risk assessment with respect to appellant. Dr. Sherman did not ask the psychology department at the hospital whether a violence risk assessment was performed as to appellant. Dr. Sherman acknowledged there was overwhelming evidence that structured approaches to risk assessments are more reliable that unstructured risk assessments. However, Dr. Sherman opined that structured violence assessments are supplemental tools and not the main criteria to determine dangerousness. Rather, it is a combination of clinical assessment, observation at the hospital, compliance, participation in the program. Additionally, risk assessment tools would probably not be able to capture appellant's case because his dangerousness is acting upon delusions, not fighting or assaults.

6.

Records indicated appellant's wife brought him to a psychiatric hospital shortly before he killed her. Appellant's sister is in regular contact with appellant, and she visits him in the hospital. Family support is a factor that tends to reduce recidivism.

### *Appellant's Testimony*

Appellant, who was 67 years old at the time of trial in July 2021, was born in Syria and moved to the United States in 1977. In the United States, he worked "pumping gas," and then as a mechanic for 20 years.

Appellant married his wife, Bahie. They had four children together, and they were "very happy." However, when they moved to Fresno in 1995, Bahie "changed" and "things became bad." Appellant believed in 1996, she abused their children. When asked at trial if that was a delusion, he said, "No. It's not a delusion. It was true." Appellant said that Bahie would "bring young men to have sexual relations with my children." Appellant "used to hear it on TV that she used to bring men so they can abuse our children." The following exchange occurred:

> "Q. When we finished we were speaking about your belief that your wife was having people over to have sex with your children. Do you still have that belief?
>
> "A. Yes. Behind my back.
>
> "Q. So you still believe that actually happened?
>
> "A. TV said so.
>
> "Q. So you don't believe that that was a delusion?
>
> "A. Well, maybe it was. But I saw it on the TV and the TV said it.
>
> "Q. So you still feel justified in killing your wife?
>
> "A. Yeah. I believe she abused them.
>
> "Q. So I take it your answer is yes, you still feel justified in killing your wife?
>
> "A. No. I don't feel justified. I think it was wrong.

7.

"Q. It was wrong to kill your wife, right?

"A. Yes. I'm very sad that she died, but there's nothing I can do about it. But it makes me very sad."

Appellant felt Bahie might marry off or arrange marriage for his daughters at a very young age.

Appellant saw the children with bruises, and saw Bahie "stomp[]" on their son's legs. Once, Bahie pointed a knife at their son's stomach.

Appellant initially denied saying Bahie was poisoning him, but instead that she was putting alcohol in his food which would make him vomit. Appellant later testified that, in the beginning, he did think it was poison. He also said Bahie would "get drunk a lot."

Before he committed what he called "my crime," appellant heard a voice. Since taking medication, he no longer hears voices. He denied ever having any visual hallucinations.

Appellant said he claimed to be the son of God in 2005, but he does not think that any longer. In the past, appellant believed that he could hear his sisters in Syria with his mind. He does not believe that now.

Appellant said he takes 30 milligrams of olanzapine at the state hospital. Appellant said the medicine helps him. Appellant would be willing to take Zyprexa "assuming there's no olanzapine." Appellant denied ever refusing Zyprexa. He would stay on his medication if released.

Appellant said that he does not participate in group sessions because he cannot hear due to a broken hearing aid. Appellant has taken English classes, but people still do not understand him sometimes.

Appellant misses his wife and children. Appellant's plan for if he is released is to live with his sister and her family. He would find a doctor for his body, a doctor for his ears, and a doctor for his mind.

## DISCUSSION

**I.    The Jury's Verdict was Supported by Substantial Evidence**

A person may be recommitted in two-year increments after the end of their maximum term of confinement when their mental disease, defect, or disorder represents a substantial danger of physical harm to others.  (§ 1026.5, subds. (b)(1) & (8).)

Here, the jury found beyond a reasonable doubt that, because of his mental disease, appellant poses a substantial danger of physical harm to others and has serious difficulty in controlling his dangerous behavior.  The court ordered appellant's commitment extended through November 12, 2021.

Appellant contends the jury's verdict was not supported by substantial evidence. We review this contention under the familiar standard for substantial evidence review.[3]

" ' "Whether a defendant 'by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony." [Citation.]  "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]" [Citation.]' [Citation.]  A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5." (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878–879.)

While appellant acknowledges there was sufficient evidence that he had a mental disorder (i.e., schizophrenia), he contends there was insufficient evidence that the disorder causes him to have serious difficulty controlling his behavior.  Not so.

---

[3] We do not consider contentions first raised in a reply brief.

Dr. Sherman testified that appellant had delusional beliefs about Zyprexa which caused him to consistently refuse to take the medication. As a result, Dr. Sherman opined there a "good chance" he would not comply with treatment due to his delusions. And, if appellant stopped psychotropic medications there is a "high probability" he would develop new delusions and have difficulty controlling dangerous behavior. In sum, Dr. Sherman testified that years of hospitalization and treatment by mental health professionals have been "unsuccessful."

Appellant points to other evidence in his favor, including his lack of aggressive behavior at the hospital, his ability to control conventionally dangerous behavior at the hospital, and risk assessments indicating his risk for physical danger is low in the hospital. These contentions fail. First and foremost, because there was substantial evidence supporting the verdict, the fact that there was also other evidence supporting appellant's position is immaterial. Second, while Dr. Sherman testified to appellant's appropriate behavior *in the hospital setting*, he also testified if appellant was released and stopped his medication, he *would* have difficulty controlling dangerous behavior outside the hospital. And while appellant was at low risk *in the hospital setting*, he also testified that if appellant was released, the danger "would be elevated to high." In sum, Dr. Sherman's testimony that appellant was low risk to others *while in the hospital* does not preclude the jury's finding that that he poses a serious risk of physical harm to others.

Appellant attempts to undermine Dr. Sherman's opinions in this regard as speculation.[4] But, as appellant acknowledges, the testimony of an expert psychiatrist in this context is "by necessity, to some extent, a prediction of future events." Nonetheless, appellant emphasizes that the prediction must be grounded in relevant facts present at the

---

[4] It could be argued that the claim Dr. Sherman's opinion was unsupported was forfeited by failure to object to expert testimony on that ground. Review for substantial evidence *includes* incompetent testimony, such as conclusion, if no objection was made thereto. (See *People v. Bailey* (1991) 1 Cal.App.4th 459, 464.) Because the parties do not address the issue, we will not resolve it.

time of the hearing. However, Dr. Sherman's testimony satisfied this requirement. Dr. Sherman credibly testified that appellant's current mental condition was such that there was a "good chance" he would not comply with treatment due to his delusions, which is why he poses a danger to others. This "prediction" was supported by the fact that appellant refuses to take Zyprexa for delusional reasons.[5]

Appellant cites to several cases where the evidence supporting recommitment was deemed sufficient and tries to distinguish them. We reject this contention because an appellate court's holding that the evidence in a particular case was *sufficient* to support the judgment is not equivalent to a holding that such evidence is *necessary* to support a judgment. Therefore, it is unpersuasive for an appellant seeking reversal to rely on such reasoning.

Appellant also cites to *People v. Galindo* (2006) 142 Cal.App.4th 531. In that case, Galindo – who had a criminal history that included forcible rape – pursued a "very fragile" psychotic patient and refused to comply when told to stop. (*Id.* at p. 534.) He had to be transferred to another unit. He was generally loud and disruptive. The appellate court acknowledged there was "abundant evidence" Galindo's behavior was dangerous and that he did not control it. However, the court held such evidence does not prove Galindo was *unable* to control it. The court said there was little, if any, evidence that Galindo *tried* to control his behavior and encountered difficulty in doing so due to his mental condition. Instead, the evidence suggested Galindo did not even try to control his behavior because he perceived no reason to do so. (*Id.* at p. 539.)

---

[5] Dr. Sherman testified that appellant refused to take Zyprexa. Appellant cites to later testimony by Dr. Sherman that appellant learned "over the years … that he can't refuse his psychiatric medication. *And he never refused his psychiatric medications at the hospital.*" (Italics added.) Given Dr. Sherman's prior testimony that appellant refuses to take Zyprexa, we understand him to be saying here that appellant does not refuse his psychiatric medication *because the hospital pharmacy always uses medication labeled olanzapine due to his refusal to take Zyprexa*. In other words, appellant *refuses* to take Zyprexa, but *agrees* to take the identical drug olanzapine, so therefore he is not considered to have "refused his psychiatric medications."

This reasoning is unpersuasive, and we reject it. The fact that Galindo did not control his behavior certainly raised an *inference* he was unable to do so, even if it does not prove it to a certainty. Moreover, the fact that Galindo "perceived no reason" to control dangerous behavior is *more* of a reason to extend his commitment, not less. *Galindo*'s reasoning would incentivize committees to not even attempt to control their dangerous behavior.

In any event, Dr. Sherman's testimony of appellant painted a picture of someone who was able to control his behavior while on medication in a hospital setting, but unable to control his behavior while off his medication outside of a hospital setting. This, combined with Dr. Sherman's testimony that there was a "good chance" appellant would not comply with his treatment outside of the hospital due to his delusions, was sufficient to support the jury's verdict.

### *Conclusion*

For all these reasons, we conclude appellant has failed to mount a successful substantial evidence challenge to the recommitment order.

### DISPOSITION

The order is affirmed.

POOCHIGIAN, Acting P. J.

WE CONCUR:

DETJEN, J.

SNAUFFER, J.